WILLIAM INGLIS & SONS BAKING
CO., et al., Plaintiffs-Appellees,

v.

ITT CONTINENTAL BAKING
COMPANY, INC., et al.,
Defendants-Appellants.

WILLIAM INGLIS & SONS BAKING
CO., et al., Plaintiffs-Appellants,

v.

ITT CONTINENTAL BAKING COMPA-
NY, INC., Defendant-Appellee.

Nos. 79–4207, 78–3604.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Nov. 10, 1980.

Decided Aug. 7, 1981.

As Amended on Denial of Rehearing and
Rehearing En Banc Feb. 10, 1982.

Amended Order March 8, 1982.

John H. Schafer, Covington & Burling, Washington, D. C., for defendants-appellants.

Michael N. Khourie, Broad, Khourie & Schulz, San Francisco, Cal., for plaintiffs-appellees.

Before BROWNING, PECK * and SNEED, Circuit Judges.

SNEED, Circuit Judge:

William Inglis & Sons Baking Co. (Inglis) brought this private antitrust suit to recover treble damages against ITT Continental Baking Co. (Continental), American Bakeries Co. (American), and Campbell-Taggart, Inc., alleging violations of sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2, section 2(a) of the Clayton Act, as amended by the Robinson-Patman Act, 15 U.S.C. § 13(a), and the California Unfair Practices Act, Cal.Bus. & Prof.Code §§ 17000–17101. Inglis also charged that Continental had conspired with its parent corporation, International Telephone & Telegraph (ITT), and others in violation of sections 1 and 2 of the

* Honorable John W. Peck, Senior United States Circuit Judge for the Sixth Circuit, sitting by designation.

Sherman Act. Both Continental and American filed counterclaims against Inglis also alleging antitrust violations, although Continental dropped its counterclaim at trial. Before trial Campbell-Taggart settled with Inglis, and the district court granted summary judgment for Continental with respect to the alleged "vertical" conspiracy between Continental, ITT, and others. Later, Inglis voluntarily dropped its horizontal conspiracy claims under section 1 against the named defendants. Following a one month trial in 1978, the jury returned a verdict against Continental on all remaining claims and awarded damages of $5,048,000. The jury found that neither American nor Inglis were liable on the claims they filed against each other.

Continental then moved for judgment notwithstanding the verdict (JNOV) or, in the alternative, a new trial on all claims. The district court granted the motions for JNOV and, in the alternative, a new trial on the federal claims but refused to grant JNOV for Continental on the state claims. Instead, a new trial was ordered. *William Inglis & Sons Baking Co. v. ITT Continental Baking Co.*, 461 F.Supp. 410 (N.D.Cal. 1978). Inglis now appeals the district court's entry of JNOV and alternative order for a new trial on the federal claims, and Continental appeals the court's refusal to enter JNOV in its favor on the state claims, pursuant to 28 U.S.C. § 1292(b). We affirm in part, reverse in part, and remand this case for a new trial.

## I.

## STATEMENT OF THE CASE

### A. *The Theory of Plaintiff's Actions*

Inglis was a family-owned wholesale bakery with production facilities located in Stockton, California. It manufactured and distributed bread and rolls in northern California. Continental is one of the nation's largest wholesale bakeries, and was a competitor of Inglis in the northern California market, with production facilities in San Francisco, Oakland, and Sacramento. The primary products involved in this case were the one pound and one and one-half pound loaves of white pan bread. During the period covered by Inglis' complaint, both Continental and Inglis sold their bread under a "private" label and an "advertised" label. Private label bread is manufactured by the wholesaler on behalf of a particular retail customer and marketed under a label exclusively held by that customer. Advertised label bread generally is a national brand name available to all retail purchasers. Continental's advertised bread bears the "Wonder" label, while Inglis marketed "Sunbeam" bread. Labeling aside, the principal difference between private label and advertised bread was one of price. Wholesale bakeries typically sold private label bread at a lower price than advertised brands and, because the products were essentially the same, at a lower profit. Both types of bread generally were manufactured at the same production facilities and both could be found on the shelves of most large retailers.

Inglis' complaint, which was filed in 1971 and supplemented in 1977, was founded on charges that Continental sought to eliminate competition in the northern California market for wholesale bread by charging discriminatory and below-cost prices for its private label bread. Inglis claims that it was the principal victim of this predatory scheme, suffering losses since 1967 and eventually going out of business in April 1976, nearly five years after it filed its initial complaint. The theory on which Inglis structured its case was that the growth of private label bread, which began in northern California in 1967 or 1968, began to weaken Continental's market for Wonder bread. In response to this challenge Continental also began selling private label bread, but the price gap between private label and Wonder bread persisted. Inglis argues that Continental then decided to pursue a strategy of predatory pricing in its sales of private label bread, with the intent of eliminating independent wholesalers like Inglis who were financially less capable of withstanding a price war. The ultimate goal, Inglis asserts, was to acquire a large

share of the private label market and then to use the enhanced market power to raise private label prices, which would diminish the competitive disadvantage of Wonder bread. Moreover, Inglis contends, the acquisition of private label accounts would enable Continental to "leverage" more shelf space for Wonder bread from those retailers who also purchased Continental's private label bread.

### B. *The Evidence Summarized*

To support its theory, Inglis introduced the following evidence.[1] First, Inglis examined the movement in Continental's prices during the complaint period, focusing on the one pound loaves of bread. In September 1970 Continental reduced the price of its private label bread from 19 to 18 cents per loaf and maintained that price for nearly two years. In July 1972 Continental further reduced its price to 17.2 cents and maintained that price through the summer of 1973. Thereafter Continental gradually began to raise the price, allegedly because it then knew that Inglis was in its death throes as a competitor.[2] Second, Inglis established that Continental suffered substantial losses from its northern california bakeries from 1971 through 1974, the period during which Continental's private label prices were at their lowest. Inglis also introduced expert testimony, based on a study of prices during brief periods in 1972 and 1973, tending to show that Continental's private label prices were below its average variable cost of production. Third, Inglis showed that Continental actively made competing offers to private label accounts held by Inglis. Although Inglis actually lost only one account to Continental, it nevertheless was forced to respond with lower prices of its own and suffer the resulting loss of revenue from sales. Finally, Inglis introduced documentary evidence

designed to prove Continental's intent to drive Inglis from the market. This evidence principally consisted of a report prepared by independent consultants identifying strategies Continental might adopt to combat private label competition. One alternative involved maintaining prices "to hasten wholesaler exit." Inglis also introduced reports by Continental salesmen targeting Inglis private label accounts for enhanced competitive efforts.

Continental's explanation of events during the complaint period, of course, differed sharply from that of Inglis. First, Continental emphasized the intensely competitive nature of the wholesale bread market in northern California and its own lack of market power. Campbell-Taggart held the largest share of the market and, although some of the evidence is ambiguous, apparently initiated price reductions that other competitors, including Continental, were forced to follow. Second, during the complaint period the market was affected by the growth of so-called "captive" bakeries. Retail stores such as Safeway established their own bakeries, thereby reducing the demand for wholesale bread products. One result was that all of the wholesale bakeries experienced excess capacity during the relevant period. As striking evidence of this, Continental proved that during an eleven-week strike in December 1972 and January 1973, which closed the bakeries operated by Continental and Campbell-Taggart, American and Inglis were able to supply the entire market with their existing capacity. In addition to creating excess capacity, the captive bakeries also exerted pressure on other retailers to provide price-competitive private label products, pressure to which Continental and other wholesalers responded.

---

1. The description that follows only highlights the evidence presented at trial. We do not pretend to provide a full account of a trial that generated nearly thirty volumes of transcribed testimony.

2. Inglis introduced a memorandum written by the manager of Continental's Sacramento bak-

ery in early 1974, which stated the manager's expectation that Inglis would not remain in business for more than one year. Inglis introduced no direct evidence that this prediction actually affected Continental's pricing decisions.

Finally, Continental emphasized that all of the bakeries were subject to federal price controls from the summer of 1971 until April 1974. Within this period the federal government also imposed a temporary price freeze during the summer months of 1973. According to Continental, the price controls contributed substantially to its inability to raise prices despite increasing costs during the period in which private label prices were at their lowest levels. Continental argues that the price increases which occurred in late 1973 and 1974 resulted not from Continental's anticipation of Inglis' demise, but from the expiration of government price constraints.[3]

From the evidence presented at trial, this much is plain: The price competition among wholesalers in northern California, all selling substantially similar products, was intense. As a result, at least in part, many bakeries failed to earn a profit and Inglis was forced to discontinue operations. The central question for the jury thus was whether Inglis was a casualty of vigorous, but honest, competition, or the victim of unfair and predatory tactics adopted by a company intent on monopolizing the market. Because there was no "smoking gun," the jury was asked to choose between the conflicting inferences drawn by Inglis and Continental and it found Inglis' explanation the more reasonable.

### C. The Findings and Holdings of the District Court

As already indicated, the district court found a lack of competent evidence to support the jury's conclusion. First it held that Inglis' expert testimony concerning below-cost pricing by Continental was either insufficient as a matter of law to establish predatory pricing for purposes of section 2 of the Sherman Act, or completely unreliable. The court determined that on the facts of this case, Inglis was required to prove that Continental's prices were below its *marginal* cost of producing bread. Proof of

pricing below *average variable cost*, which the court in any event found not to be controlling, was insufficient. With respect to Inglis' Robinson-Patman Act claim, the court held that Inglis' failure to show pricing below marginal cost also prevented it from establishing the injury to competition required by Robinson-Patman. The court ordered a new trial on the state claim because it found that the weight of the evidence supported Continental's defense of meeting competition. Finally, the court held that a new trial was warranted because the jury's damage award was excessive and unsupported by the weight of the evidence.

### D. Standards of Review

■ In passing on the district court's decision, we are mindful of the deference due the verdict of a jury. To determine whether an entry of JNOV is proper, we must apply the same standard applied by the district court. *Alioto v. Cowles Communications, Inc.*, 519 F.2d 777, 780 (9th Cir.), *cert. denied*, 423 U.S. 930, 96 S.Ct. 280, 46 L.Ed.2d 259 (1975). That is, we must affirm the district court if, without accounting for the credibility of the witnesses, we find that the evidence and its inferences, considered as a whole and viewed in the light most favorable to the nonmoving party, can support only one reasonable conclusion—that the moving party is entitled to judgment notwithstanding the adverse verdict. *Davison v. Pacific Inland Navigation Co.*, 569 F.2d 507, 509 (9th Cir. 1978); *Maheu v. Hughes Tool Co.*, 569 F.2d 459, 464 (9th Cir. 1977); *Fount-Wip, Inc. v. Reddi-Wip, Inc.*, 568 F.2d 1296, 1300 (9th Cir. 1978). Neither the district court nor this court is free to weigh the evidence or reach a result that it finds more reasonable as long as the jury's verdict is supported by substantial evidence. *Marquis v. Chrysler Corp.*, 577 F.2d 624, 631 (9th Cir. 1978); *Cockrum v. Whitney*, 479 F.2d 84, 86 (9th Cir. 1973).

---

**3.** It is undisputed that some price increases were allowed during the price control years and that Continental took advantage of the allowances to increase the price of Wonder bread.

The parties, however, offered different reasons for Continental's failure to increase the price of private label bread when the opportunities were available.

In contrast, a new trial may be ordered by the district court if, in its opinion, the jury's verdict was clearly contrary to the weight of the evidence. We may reverse such an order only if we find that the district court abused its discretion as to each ground upon which its decision was based. *Traver v. Meshriy*, 627 F.2d 934, 940–41 (9th Cir. 1980); *Peacock v. Board of Regents*, 597 F.2d 163, 165 (9th Cir. 1979); *Fount-Wip, supra*, 568 F.2d at 1302; *Hanson v. Shell Oil Co.*, 541 F.2d 1352, 1359 (9th Cir. 1976), *cert. denied*, 429 U.S. 1074, 97 S.Ct. 813, 50 L.Ed.2d 792 (1977).

## II.

## THE SECTION 2 ATTEMPT TO MONOPOLIZE CLAIM—PREDATORY PRICING

Bearing in mind these standards, we shall consider, first, the district court's entry of JNOV for Continental with respect to the jury's finding that Continental attempted to monopolize the wholesale bread market in northern California by predatorily pricing its products and, next, its alternative order requiring a new trial on the ground that Inglis failed to prove predatory conduct.

### A. *The Elements of an Attempt Claim*

Although the law of this circuit on attempted monopolization has not been static, its current state recognizes three elements of an attempt claim under section 2 of the Sherman Act: (1) specific intent to control prices or destroy competition in some part of commerce; (2) predatory or anticompetitive conduct directed to accomplishing the unlawful purpose; and (3) a dangerous probability of success. *E. g., California Computer Products, Inc. v. IBM Corp.*, 613 F.2d 727, 736 (9th Cir. 1979) (*CalComp*). To state these elements, however, is merely to begin the process of understanding the legal standards of conduct under an attempt claim. Each element interacts with the others in significant and unexpected ways. Because the parties dispute the nature of their interdependence, we must discuss each in some detail. For reasons that will appear later, the third element will be discussed second rather than last.

### 1. *Specific Intent*

The element of specific intent appears to have had its genesis in the distinctions—and similarities—between *monopolization* and *attempted monopolization*, both of which are proscribed in separate terms by section 2. *See* Cooper, *Attempts and Monopolization: A Mildly Expansionary Answer to the Prophylactic Riddle of Section Two*, 72 Mich.L.Rev. 375 (1974). Thus, section 2 embraces not only an uncertain collection of evils termed "monopolization," but also conduct falling short of that result. By analogy to the law of criminal attempt, the requirement of specific intent is used to confine the reach of an attempt claim to conduct threatening monopolization. *See Times-Picayune Publishing Co. v. United States*, 345 U.S. 594, 626, 73 S.Ct. 872, 889, 97 L.Ed. 1277 (1953); *United States v. Griffith*, 334 U.S. 100, 105, 68 S.Ct. 941, 944, 92 L.Ed. 1236 (1948); *Swift & Co. v. United States*, 196 U.S. 375, 396, 25 S.Ct. 276, 279, 49 L.Ed. 518 (1905).

Whatever its origins, the existence of specific intent may be established not only by direct evidence of unlawful design, but by circumstantial evidence, principally of illegal conduct. *E. g., CalComp, supra*, 613 F.2d at 736; *Sherman v. British Leyland Motors, Ltd.*, 601 F.2d 429, 453 n.47 (9th Cir. 1979); *Gough v. Rossmoor Corp.*, 585 F.2d 381, 390 (9th Cir. 1978), *cert. denied*, 440 U.S. 936, 99 S.Ct. 1280, 59 L.Ed.2d 494 (1979); *Janich Bros., Inc. v. American Distilling Co.*, 570 F.2d 848, 853–54 (9th Cir. 1977), *cert. denied*, 439 U.S. 829, 99 S.Ct. 103, 58 L.Ed.2d 122 (1978). Too heavy a reliance on circumstantial evidence incurs the risk of reducing almost to the point of extinction the existence of the requirement. The type of conduct that will support the inference, therefore, must be carefully defined. This court has made it clear that the nature of such conduct varies with the conditions of the market and the characteristics of the defendant.

■ Thus, we consistently have held that the inference may be drawn from conduct that serves as the basis for a substantial claim of restraint of trade.[4] Several cases, for example, have explicitly equated such conduct with an unreasonable restraint of trade in violation of section 1 of the Sherman Act. *CalComp, supra,* 613 F.2d at 736; *Sherman, supra,* 601 F.2d at 453 n.47; *Gough, supra,* 585 F.2d at 390. Actions taken by a firm without market power may support the inference of intent if those actions are "of a kind clearly threatening to competition or clearly exclusionary." *Janich Bros., supra,* 570 F.2d at 854 n.4.[5] Some opinions have taken this language to refer to *per se* violations of section 1. *E. g., CalComp, supra,* 613 F.2d at 737 & n.10; *Gough, supra,* 585 F.2d at 390.

■ On the other hand, direct evidence of intent alone, without corroborating evidence of conduct, cannot sustain a claim of attempted monopolization. *See Hunt-Wesson Foods, Inc. v. Ragu Foods, Inc.,* 627 F.2d 919, 926 (9th Cir. 1980); *Blair Foods, Inc. v. Ranchers Cotton Oil,* 610 F.2d 665, 669 (9th Cir. 1980); *Knutson v. Daily Review, Inc.,* 548 F.2d 795, 814 (9th Cir. 1976), *cert. denied,* 433 U.S. 910, 97 S.Ct. 2977, 53 L.Ed.2d 1094 (1977); *Chisholm Brothers Farm Equipment Co. v. International Harvester Co.,* 498 F.2d 1137, 1144–45 (9th Cir.), *cert. denied,* 419 U.S. 1023, 95 S.Ct. 500, 42 L.Ed.2d 298 (1974); *Hallmark Industry v. Reynolds Metals Co.,* 489 F.2d 8, 12 (9th Cir. 1973), *cert. denied,* 417 U.S. 932, 94 S.Ct. 2643, 41 L.Ed.2d 235 (1974). The necessity of corroborative conduct rests on the fact that direct evidence of intent alone can be ambiguous and misleading.[6] The law of attempted monopolization must tread a narrow pathway between rules that would inhibit honest competition and those that would allow pernicious but subtle conduct to escape antitrust scrutiny. Direct evidence of intent to vanquish a rival in an honest competitive struggle cannot help to establish an antitrust violation.[7] It also must be shown that the defendant sought victory through unfair or predatory means. Evidence of conduct is thus indispensable.

■ The language and purpose of section 2 reinforces this necessity. While the prohibition of attempts to monopolize clearly encompasses actions that fall short of their intended result, it is equally clear that actual steps toward interference with the competitive process, and not boardroom ruminations, is the evil against which section 2 is directed. As Justice Holmes taught us, there is a difference, even in antitrust law, between preparation and attempt. *Swift & Co., supra,* 196 U.S. at 402, 25 S.Ct. at 281.

---

4. *CalComp, supra,* 613 F.2d at 736; *Sherman, supra,* 601 F.2d at 453 n.47; *Gough, supra,* 585 F.2d at 390; *Janich Bros., supra,* 570 F.2d at 853–54; *Trixler Brokerage Co. v. Ralston Purina Co.,* 505 F.2d 1045, 1052 (9th Cir. 1974); *Bushie v. Stenocord Corp.,* 460 F.2d 116, 121 (9th Cir. 1972).

5. *Accord Hunt-Wesson Foods, Inc. v. Ragu Foods, Inc.,* 627 F.2d 919, 925, 926 (9th Cir. 1980); *CalComp, supra,* 613 F.2d at 737; *Sherman, supra,* 601 F.2d at 453 n.47; *Gough, supra,* 585 F.2d at 390.

6. What juries (and many judges) do not understand is that the availability of evidence of improper intent is often a function of luck and of the defendant's legal sophistication, not of the underlying reality. A firm of executives sensitized to antitrust problems will not leave any documentary trail of improper intent; one whose executives lack this sensitivity will often create rich evidence of such intent simply by the clumsy choice of words to describe innocent behavior. Especially misleading here is the inveterate tendency of sales executives to brag to their superiors about their competitive prowess, often using metaphors of coercion that are compelling evidence of predatory intent to the naive. Any doctrine that relies upon proof of intent is going to be applied erratically at best. R. Posner, Antitrust Law—An Economic Perspective 189–90 (1976).

7. "The mere intention of [defendant] to exclude competition . . . is insufficient to establish specific intent to monopolize by some illegal means. . . . To conclude otherwise would contravene the very essence of a competitive marketplace which is to prevail against all competitors." *Blair Foods, supra,* 610 F.2d at 670 (citation omitted). *Accord, Buffalo Courier Express, Inc. v. Buffalo Evening News, Inc.,* 601 F.2d 48, 54 (2d Cir. 1979); *Hayes v. Solomon,* 597 F.2d 958, 977 (5th Cir. 1979), *cert. denied,* 444 U.S. 1078, 100 S.Ct. 1028, 62 L.Ed.2d 761 (1980).

## 2. Dangerous Probability of Success

██ The third element, dangerous probability of success, like the first, also is rooted in the relationship between the separate offenses of monopolization and attempt to monopolize. *See, e. g., Swift & Co., supra,* 196 U.S. at 396, 25 S.Ct. at 279.[8] Although this element is generally treated as separate and independent, it can be inferred from evidence indicating the existence of the other two. *E.g., CalComp, supra,* 613 F.2d at 737. However, the proper significance of this third element "has been controversial, even within this circuit." *Hunt-Wesson Foods, supra,* 627 F.2d at 925.

██ Part of the uncertainty results, as already indicated, from the tendency to treat the element of dangerous probability of success and proof of market power as equivalent. Although related, they are not equivalent. Another source of uncertainty, also previously suggested, is that a dangerous probability of success has been treated as evidence of specific intent and vice versa. *See Lessig v. Tidewater Oil Co.,* 327 F.2d 459, 474 (9th Cir.), *cert. denied,* 377 U.S. 993, 84 S.Ct. 1920, 12 L.Ed.2d 1046 (1964).[9] However, our more recent decisions make plain that the permissibility of inferring dangerous probability from proof of specific intent is conditional. That is, a dangerous probability of success may be inferred either (1) from direct evidence of specific intent plus proof of conduct directed to accomplishing the unlawful design,[10] or (2) from evidence of conduct alone, provided the conduct is also the sort from which specific intent can be inferred.[11]

██ These more recent decisions also establish that the dangerous probability of success requirement is not designed as a means of screening out cases of minimal concern to antitrust policy but is instead a way of gauging more accurately the purpose of a defendant's actions. Accordingly, the level of the probability of success appro-

---

**8.** The requirement of dangerous probability of success originated in Justice Holmes' opinion in *Swift*:

> Where acts are not sufficient in themselves to produce a result which the law seeks to prevent,—for instance, the monopoly,—but require further acts in addition to the forces of nature to bring that result to pass, an intent to bring it to pass is necessary in order to produce a dangerous probability that it will happen.... But when that intent and the consequent dangerous probability exist, this statute, like many others, and like the common law in some cases, directs itself against that dangerous probability as well as against the completed result.

*Swift & Co., supra,* 196 U.S. at 396, 25 S.Ct. at 279. A careful reading of this language supports the rule of this circuit that dangerous probability of success may be inferred from proof of specific intent. Justice Holmes does not refer to dangerous probability as an independent element, but rather as the consequence of an intent to monopolize, or perhaps as "the *rationale* which underlies the legal requirement that there be a specific intent to monopolize before an attempt is found." L. Sullivan, Handbook of the Law of Antitrust § 51, at 137 (1977) (emphasis in original).

**9.** Since *Lessig* we have reiterated that although proof of defendant's market power may be relevant both in establishing the probability of success and in determining whether the defendant intended to control prices or exclude competition, it is not essential in establishing those claims. *E. g., Hunt-Wesson, supra,* 627 F.2d at 926 & n.3; *CalComp, supra,* 613 F.2d at 737; *Blair Foods, supra,* 610 F.2d at 669–70.

**10.** *Janich Bros., supra,* 570 F.2d at 853; *Moore v. Jas. H. Matthews & Co.,* 550 F.2d 1207, 1219 (9th Cir. 1977); *Pacific Coast Agricultural Export Ass'n v. Sunkist Growers, Inc.,* 526 F.2d 1196, 1205 (9th Cir. 1975), *cert. denied,* 425 U.S. 959, 96 S.Ct. 1741, 48 L.Ed.2d 204 (1976); *Hallmark, supra,* 489 F.2d at 12.

**11.** *See Hunt-Wesson, supra,* 627 F.2d at 926; *CalComp, supra,* 613 F.2d at 737; *Sherman, supra,* 601 F.2d at 453 n.47; *Janich Bros., supra,* 570 F.2d at 854 & n.4; *Hallmark, supra,* 489 F.2d at 12–13; *Bushie v. Stenocord Corp.,* 460 F.2d 116, 121 (9th Cir. 1972). As our earlier discussion indicates, this sort of conduct must fall into one of two categories: either (1) conduct forming the basis for a substantial claim of restraint of trade, or (2) conduct that is clearly threatening to competition or clearly exclusionary. Proof of market power in the defendant may be relevant in establishing the requisite unreasonable conduct, but it is not essential. Such proof may also be relevant, as some cases seem to establish, because it may serve as sufficient direct proof of dangerous probability of success. *See CalComp, supra,* 613 F.2d at 737; *Sherman, supra,* 601 F.2d at 453 n. 47; *Janich Bros, supra,* 570 F.2d at 853; *Hallmark, supra,* 489 F.2d at 12. *See* note 15 *infra.*

priately may be raised by the defendant, as did Continental in this case, even if the plaintiff has made his case without direct proof of dangerous probability. Thus, if market conditions are such that a course of conduct described by the plaintiff would be unlikely to succeed in monopolizing the market, it is less likely that the defendant actually attempted to monopolize the market.[12] Conversely, a firm with substantial market power may find it more rational to engage in a monopolistic course of conduct than would a smaller firm in a less concentrated market.[13]

In sum, the dangerous probability of success element is always relevant in analyzing an attempt claim. The nature of its relevance, however, is a function of the state of the evidence offered in support of the other two elements necessary to proof of the claim.

### 3. Conduct

The conduct element of the attempt claim also is closely related to the other two elements. Thus, the first element, specific intent to control prices or exclude competition, may be inferred from certain types of conduct. The third element, dangerous probability of success, also is often dependent on proof of conduct. Finally, evidence of conduct is indispensable even when there is direct evidence of unlawful specific intent.

This interrelationship extends to the type and strength of proof required to establish each element. In the absence of direct and probative evidence of specific intent to monopolize, for example, a plaintiff must introduce evidence of conduct amounting to a substantial claim of restraint of trade or conduct clearly threatening to competition or clearly exclusionary.[14] Direct evidence of intent, on the other hand, may permit reliance on a broader range of conduct, simply because the purpose of ambiguous conduct may be more clearly understood.[15] But, in general, conduct that will support a claim of attempted monopolization must be such that its anticipated benefits were dependent upon its tendency to discipline or eliminate competition and thereby enhance the firm's long-term ability to reap the benefits of monopoly power. Such conduct is not true competition; it makes sense only because it elimi-

---

**12.** See Hunt-Wesson, supra, 627 F.2d at 927; Blair Foods, supra, 610 F.2d at 669–70; Mutual Fund Investors, Inc. v. Putnam Management Co., 553 F.2d 620, 627 (9th Cir. 1977).

**13.** Two commentators recently proposed a means of selecting rules directed against predatory conduct on a basis similar to this one. Jaskow & Klevorick, A Framework for Analyzing Predatory Pricing Policy, 89 Yale L.J. 213 (1979).

**14.** As we already have noted, this description of conduct draws upon standards developed in the context of section 1 of the Sherman Act. However, section 2 of the Act encompasses a broader range of conduct. For example, unlike section 1, section 2 is not limited to concerted or contractual activity. CalComp, supra, 613 F.2d at 737; Moore v. Jas. H. Matthews & Co., 473 F.2d 328, 332 (9th Cir. 1972). Actions taken by a single firm which attempts to monopolize may have no obvious counterparts in the case law of section 1. However, by drawing upon section 1 we have given general direction to the construction of section 2. Thus, we have held that the "reasonableness" standard of section 1 is to control the analysis of most conduct from which specific intent to monopolize may be inferred. CalComp, supra,

613 F.2d at 737. The remainder of this section elaborates on that concept.

**15.** As our earlier discussion of the first two elements of the attempt claim recognizes, several cases have also suggested that the type of conduct sufficient to establish attempted monopolization may vary with the market power of the defendant. E. g., Hunt-Wesson, supra, 627 F.2d at 925; CalComp, supra, 613 F.2d at 737 & n.11; Purex Corp. v. Procter & Gamble Co., 596 F.2d 881, 890 (9th Cir. 1979); Janich Bros., supra, 570 F.2d at 854 n.4. This general proposition may prove accurate in particular cases, but we do not read our decisions as establishing any necessary or specific connection between a defendant's market power and the type of conduct a plaintiff must prove in support of its attempt claim. A plaintiff may show that proof of market power is relevant to an accurate understanding of a particular defendant's conduct, but the general standards for conduct that we discuss in the text must be the ultimate touchstone. We note that the present case is not one in which it is necessary to specify the connection between market power and conduct.

nates competition. It does not enhance the quality or attractiveness of the product, reduce its cost, or alter the demand function that all competitors confront. Its purpose is to create a monopoly by means other than fair competition.[16]

We now turn to the specific facts and arguments of the case at bar.

### B. Predatory Pricing

Inglis alleged in support of its section 2 claim that Continental set predatory prices for its private label bread with the purpose of eliminating weaker bread wholesalers. In support Inglis presented to the jury testimony and documentary evidence relating to Continental's intent as well as expert testimony demonstrating the relationship between Continental's prices and various categories of costs. In granting Continental's motion for JNOV, the district court determined that Inglis had failed to present competent evidence of predatory conduct according to legal standards which Inglis now challenges on appeal. In granting Continental's alternative motion for a new trial, the court found that Inglis' expert

testimony was unreliable,[17] and apparently discounted Inglis' direct evidence of intent on the ground that such evidence was insufficient as a matter of law, absent evidence of predatory conduct. 461 F.Supp. at 422 n.11.

### 1. When Is a Price Predatory?

Much of the dispute on appeal concerns the proper relationship between direct evidence of intent and evidence concerning the relationship between the cost and price of Continental's products. As already indicated, a distinction must be maintained between a "predatory" price and a "competitive" one. Constraints must be developed that will deter the former, but not the latter. See Joskow & Klevorick, A Framework for Analyzing Predatory Pricing Policy, 89 Yale L.J. 213, 220–22 (1979).[18]

Price reductions that constitute a legitimate, competitive response to market conditions are entirely proper. "Pricing is predatory only where the firm foregoes short-term profits in order to develop a market position such that the firm can later raise prices and recoup lost profits . . . ."

---

**16.** We have frequently referred to such activity as conduct "without legitimate business purpose." Janich Bros., supra, 570 F.2d at 853; Greyhound Computer Corp. v. IBM Corp., 559 F.2d 488, 505 (9th Cir. 1977), cert. denied, 434 U.S. 1040, 98 S.Ct. 782, 54 L.Ed.2d 790 (1978); Knutson, supra, 548 F.2d at 814; Chisholm Brothers, supra, 498 F.2d at 1145; Hallmark, supra, 489 F.2d at 12.

**17.** This judgment was based largely on the fact that Inglis' expert did not make an independent analysis of Continental's costs to determine which were variable and which were fixed. 461 F.Supp. at 419. Instead, Inglis' counsel provided the expert with a list of those costs he was to consider variable, based on a similar list which appeared in Janich Bros., Inc. v. American Distilling Co., supra. The district court obviously was not convinced that these costs were actually variable in Continental's case. See 461 F.Supp. at 418. This same conviction appears to have been the basis for the court's decision to grant JNOV. If the Janich categories were to control, then the resulting calculation of average variable cost, in the court's opinion, would "distort" the actual conditions confronting Continental in the sense that Continental was able to "maximize profits" at a nonpredatory price that was nonetheless below average variable cost. The court therefore concluded that without proof of prices below marginal cost, Inglis could not prove that Continental's prices were predatory. See id. at 418–19 & n.7.

**18.** Narrow objective standards for establishing predatory pricing pose special risks consisting of the possibility that either some competitive behavior will be condemned or that some predatory activity will be condoned. It may be argued that reduction of this latter risk can be achieved by reliance on direct evidence of predatory intent. As already explained, however, reliance on evidence of intent when objective evidence of conduct is either ambiguous or nonexistent embodies its own risks. Accord, In re E. I. DuPont de Nemours & Co., FTC Docket No. 9108 (Oct. 20, 1980), reprinted in Antitrust & Trade Reg. Rep. No. 987, at F–5 (Oct. 30, 1980) ("[I]ntent is a barren issue without consideration of the means contemplated for acquiring monopoly power. It is simply unrealistic to divorce conduct from intent.") The proper way to minimize all risks is to eschew dogmatic adherence to a particular, rigid test and to fashion broad and flexible objective standards concerned with accurately evaluating the purposes of business behavior.

*Janich Bros., supra,* 570 F.2d at 856; *Hanson v. Shell Oil Co.,* 541 F.2d 1352, 1358 (9th Cir. 1976), *cert. denied,* 429 U.S. 1074, 97 S.Ct. 813, 50 L.Ed.2d 792 (1977).[19] Although this standard captures the distinction between competitive and anticompetitive price reductions, many authorities have offered more specific economic tests to define the difference.[20]

### 2. The Areeda-Turner Test

One such economic test that has found favor in this and other circuits was developed by Professors Areeda and Turner. *See* Areeda & Turner, *Predatory Pricing and Related Practices Under Section 2 of the Sherman Act,* 88 Harv.L.Rev. 697 (1975). In their view a price should not be considered predatory if it equals or exceeds the marginal cost of producing the product. When a firm prices at marginal cost, they argue, only less efficient firms will suffer larger losses per unit of output at that price. Moreover, such pricing enables resources to be properly allocated because the price accurately "signals" to the consumer the true social cost of the product. Therefore, "pricing at marginal cost is the competitive and socially optimal result." *Id.* at 711. In contrast, pricing below marginal cost should be conclusively presumed illegal.[21] Recognizing that business records rarely reflect marginal costs of production, Areeda and Turner suggest the use of average variable cost as an evidentiary surrogate.[22]

This test has had its critics [23] to whom the creators have responded [24] and even revised some portions of their theory.[25] Courts that have adopted the Areeda-Turner test have not done so unqualifiedly. We are no exception.

Our first discussion of the test appears in *Hanson v. Shell Oil Co.,* 541 F.2d 1352 (9th Cir. 1976), *cert. denied,* 429 U.S. 1074, 97

**19.** This standard has received approval in the academic community, although more specific economic tests remain a matter of dispute. *See, e. g.,* R. Bork, The Antitrust Paradox: A Policy at War with Itself 144 (1978); L. Sullivan, *supra* note 8, § 43, at 108, 113; Areeda & Turner, *Predatory Pricing and Related Practices Under Section 2 of the Sherman Act,* 88 Harv.L.Rev. 697, 698 (1975); Joskow & Klevorick, *supra* note 13, at 220 & n.22.

**20.** Most commentators who have attempted to develop economic tests of predatory pricing have assumed that the goal of these tests should be the efficient allocation of society's resources, or, in the language of welfare economics, the improvement of allocative efficiency. *See, e.g.,* Areeda & Turner, *supra* note 19, at 712; Areeda & Turner, *Williamson on Predatory Pricing,* 87 Yale L.J. 1337, 1339 (1978); Scherer, *Predatory Pricing and the Sherman Act: A Comment,* 89 Harv.L.Rev. 869, 883 (1976); Schmalensee, *On the Use of Economic Models in Antitrust: The ReaLemon Case,* 127 U.Pa.L.Rev. 994, 994 n.2 (1979); Williamson, *Predatory Pricing: A Strategic and Welfare Analysis,* 87 Yale L.J. 284, 289 (1977).

**21.** Areeda and Turner make an exception for the case in which marginal cost exceeds average total cost. In this exceptional case the price "floor" is average total cost. Areeda & Turner, *supra,* note 19, at 713.

**22.** They argue that even when the two cost measures diverge, average variable cost is the proper test for predatory pricing. Their justifications for this position seem contradictory to the resource allocation policies that they rely upon in support of the marginal cost test. For example, although Areeda and Turner may be correct that pricing below average variable cost should be condemned because such a price rarely will be loss-minimizing, *see id.* at 717, on their view marginal cost pricing would still seem to be justifiable because it promotes proper resource allocation.

**23.** *E. g.,* L. Sullivan, *supra* note 8, § 43, at 109–10; R. Posner, *supra* note 6, at 184–96, Baumol, *Quasi-Permanence of Price Reductions: A Policy for Prevention of Predatory Pricing,* 89 Yale L.J. 1 (1979); Jaskow & Klevorick, *supra* note 13; Scherer, *supra* note 20; Scherer, *Some Last Words on Predatory Pricing,* 89 Harv.L.Rev. 901 (1976); Schmalensee, *supra* note 20; Williamson, *supra* note 20; Williamson, *Williamson on Predatory Pricing II,* 88 Yale L.J. 1183 (1979).

**24.** Areeda & Turner, *Scherer on Predatory Pricing: A Reply,* 89 Harv.L.Rev. 891 (1976); Areeda & Turner, *Williamson on Predatory Pricing,* 87 Yale L.J. 1337 (1978).

**25.** For example, Areeda and Turner now favor a categorical determination of variable costs, in which the authors label as "variable" cost items that they admit are "to varying degrees ... really 'fixed.'" 3 P. Areeda & D. Turner, Antitrust Law ¶ 715c, at 173–74, 176 (1978).

S.Ct. 813, 50 L.Ed.2d 792 (1977). There we affirmed a directed verdict for the defendant on a section 2 attempt claim. The plaintiffs failed to introduce direct evidence of specific intent and also were unable to demonstrate that the defendant's prices were below its marginal or average variable cost. The opinion, however, suggested two departures from the Areeda-Turner rule. First, it was recognized that a defendant may be allowed to prove "nonpredatory and acceptable business reasons" for prices that are below even marginal or average variable cost. *Id.* at 1359 n.6. Second, the possibility was raised that a plaintiff could make a case of predatory pricing if defendant's prices, although above marginal or average variable cost, were below its short-run profit-maximizing price and if barriers to entry were great enough to prevent entry long enough to permit the predator to reap the benefits of its enhanced market position. *Id.* at 1358 n.5.[26]

The Areeda-Turner test also was discussed in *Janich Bros., Inc. v. American Distilling Co.,* 570 F.2d 848 (9th Cir. 1977), *cert. denied,* 439 U.S. 829, 99 S.Ct. 103, 58 L.Ed.2d 122 (1978). There we again affirmed the district court's directed verdict in favor of the defendant. We stated that "an across-the-board price set at or above marginal cost should not *ordinarily* form the basis for an antitrust violation," *id.* at 857 (emphasis added), and that, on the facts of that case, the plaintiff's failure to present evidence of price below average variable cost justified a directed verdict, *id.* at 857–58. As in *Hanson,* no direct evidence of intent was admitted at trial. *Id.* at 859.

Finally, we again upheld a directed verdict in favor of the defendant in *California Computer Products, Inc. v. IBM Corp.,* 613 F.2d 727 (9th Cir. 1979). Our view of the evidence was that the defendant's price reductions were still "substantially profitable" and were made in response to lower-priced competition. The plaintiff had failed to prove pricing below marginal or average variable cost, "which ordinarily is required to show predatory pricing." *Id.* at 740 n.19. However, we also recognized "that refinement of the marginal or average variable cost test will be necessary as future cases arise." *Id.* at 743.

> For instance, limit pricing by a monopolist might, on a record which presented the issue, be held an impermissible predatory practice .... And we do not foreclose the possibility that a monopolist who reduces prices to some point above marginal or average variable costs might still be held to have engaged in a predatory act because of other aspects of its conduct.

*Id.* (citations omitted)

3. *This Court's Approach to Establishing Predation*

Thus, although we have approved the use of marginal or average variable cost statistics in proving predation, "we have not held that mode of proof to be exclusive." *Arizona v. Maricopa County Medical Society,* 643 F.2d 553, 559 n.6 (9th Cir. 1980), *cert. granted,* 450 U.S. 979, 101 S.Ct. 1512, 67 L.Ed.2d 813 (1981). While *Hanson, Janich,* and *CalComp* each upheld directed verdicts when the plaintiffs failed to introduce evidence of prices below marginal or average variable cost, those holdings cannot be divorced from the factual contexts in which they arose.[27]

**26.** In *Pierce Packing Co. v. John Morrell & Co.,* 633 F.2d 1362 (9th Cir. 1980), the appellant argued that the district court erred in failing to instruct the jury on this method of establishing predation. The appellant, however, had failed to raise the objection at trial and the sole issue was whether the question could nevertheless be raised on appeal. Applying the standard of *Robinson v. Heilman,* 563 F.2d 1304, 1307 (9th Cir. 1977), we held that it could not. As was necessary to this result, we found that "[t]he barrier to entry exception was certainly not foreclosed by a solid wall of circuit authority prior to the time the jury retired." 633 F.2d at 1366–67. We believe the question is still an open one.

**27.** In *Pierce Packing Co. v. John Morrell & Co., supra,* the appellant argued that the Areeda-Turner test was not the exclusive method of proving predatory pricing, and offered two alternative tests. *Pierce Packing,* however, did not reach the merits of that argument because the appellant's failure to object at trial preclud-

Our approach to proof of intent through use of conduct is to focus on what a rational firm would have expected its prices to accomplish. As *Hanson* and *Janich* suggest, a price should be considered predatory if its anticipated benefits depended on its tendency to eliminate competition.[28] If the justification for a price reduction did not depend upon this anticipated effect, then it does not support a claim of attempted monopolization, even if it had the actual effect of taking sales from competitors. We emphasize a defendant's rational expectations to avoid penalizing innocent miscalculations that result in anticipated profits being turned into losses, with damaging effects on competitors. Our focus does not require that plaintiffs in all cases come forward with evidence of the defendant's subjective state of mind. Predatory pricing may be proved by examining the relationship between the defendant's prices and costs. But such proof must tend to show that the anticipated benefits of the prices, at the time they were set, depended on their anticipated destructive effect upon competition and the consequent enhanced market position of the defendant.[29]

---

ed it from raising the issue on appeal. *See* 633 F.2d at 1366–67.

The issue of predatory pricing also was raised in another recent case, *Murphy Tugboat Co. v. Crowley*, 658 F.2d 1256 (9th Cir. 1981). Both plaintiff and defendant were tugboat companies in the business of assisting ships to dock and undock in San Francisco Bay. Many of defendant's tugboat masters also were licensed inland pilots. They provided piloting services, for a separate fee, to defendant's customers in conjunction with ship assisting services. The fee charged for this service was established by agreement between defendant and an association of defendant's employees. The fees thus charged generally were lower than fees charged by independent pilots, who were used by plaintiff's customers. Plaintiff alleged that the agreement establishing piloting fees was an unreasonable restraint of trade in violation of Sherman § 1, and won a jury verdict to that effect. The district court granted JNOV in defendant's favor. We affirmed.

Because plaintiff was not in the business of providing piloting services, we determined that the fee agreement could be judged only as a means employed by defendant to reduce the overall price of a package of services consisting of piloting and ship assisting. The evidence indicated that defendant's package cost was twice as high as the average package cost of using plaintiff plus a more expensive independent pilot. Plaintiff argued, however, that but for the agreement this package price would have been higher still, enabling plaintiff to earn higher revenues on its own ship assisting services. Nevertheless, we held that the agreement could be considered an unreasonable restraint of trade only if it was "in furtherance of a scheme of predatory pricing." 658 F.2d at 1259. We concluded that JNOV was warranted because plaintiff had failed even to allege that defendant's package price was below marginal cost. *Id.* Indeed, the district court noted that defendant's prices "exceeded average variable costs, exceeded the prices charged by plaintiff, and generally even produced a net profit." *Murphy Tugboat Co. v. Shipowners & Merchants Towboat Co.*, 467 F.Supp. 841, 861 n.16 (N.D.Cal.1979).

We do not consider our decision today to be inconsistent with *Murphy Tugboat*. There is no indication that the issue squarely presented to us—whether a case of predatory pricing can ever be established without proof of pricing below marginal or average variable cost—was presented to or considered in *Murphy Tugboat*. We decline to read that case as deciding the issue *sub silentio*. Our preceding discussion has also demonstrated that the decisions on which *Murphy Tugboat* relied without elaboration—*Pierce Packing, CalComp, Janich Bros.,* and *Hanson*—left the question an open one. Finally, for all that appears, plaintiff in *Murphy Tugboat* alleged nothing more than the fact that the agreement between defendant and its employees left defendant's prices lower than they otherwise would have been. The holding that such an allegation cannot establish an unreasonable restraint of trade for purposes of section 1 of the Sherman Act certainly does not foreclose the inquiry which we have undertaken here.

**28.** *See* Markovits, *supra* note 21, at 578, 594; Markovits, *Some Preliminary Notes on the Antitrust Laws' Economic Tests of Legality*, 27 Stan.L.Rev. 841 (1975).

**29.** We emphasize that this test is not meant to condemn all pricing that is not profit-maximizing in the short run. Pricing of this sort may be legitimate, competitive behavior under certain circumstances. *See, e. g.*, Areeda & Turner, *supra* note 19, at 704. Pricing is predatory if its benefits depend on its anticipated tendency to eliminate competition. Pricing that is not profit-maximizing in the short run may be predatory, but it may also be justifiable without regard to its effect on competition. In other words, pricing may legitimately be justified on long-term considerations, as long as those do not include the anticipation of enhanced market power as a result of predation.

■ In this case Continental has conceded that some of the prices challenged by Inglis were below average total cost.[30] Taken alone this does not brand Continental's prices as predatory. Pricing below average total cost may be a legitimate means of minimizing losses, particularly when the firm is "temporarily" experiencing "excess capacity" in its productive facilities.[31] When this is the case, the firm's average variable cost—the sum of those costs that vary with output divided by the total units of output—generally will be less than the firm's marginal cost—the variable cost associated with producing the last unit of output. Prices below the average total cost of production, but above the average variable cost, may represent a legitimate means of minimizing losses during the period of inadequate demand. Such a price will be sufficient to recover the variable costs of production and at least some portion of the firm's fixed costs—those costs that would remain even if the firm ceased production. To discontinue production under these circumstances would increase losses because even that portion of its total fixed costs would be lost. Pricing at this level, however, will not be rational over the long term because it will not justify renewal of investment at the previous level. If demand does not increase and thus justify a greater price at the point at which investment must be renewed, discontinuance of production, in whole or in part, is required.

■ Although pricing below average total cost in the short term may be legitimate, it is less likely that pricing below average variable cost will be. Such pricing, if sustained, will not permit the recovery of any portion of the firm's fixed costs. In addition, the firm, because it cannot recover all its variable costs, has out-of-pocket losses on each unit it sells. The economic case for discontinuance of production is strong.[32]

■ Although pricing below average total cost and above average variable cost is not inherently predatory, it does not follow, however, that such prices are never predatory. Predation exists when the justification of these prices is based, not on their effectiveness in minimizing losses, but on their tendency to eliminate rivals and create a market structure enabling the seller to recoup his losses. This is the ultimate standard, and not rigid adherence to a particular cost-based rule, that must govern our analysis of alleged predatory pricing.

■ Guided by these principles, we hold that to establish predatory pricing a plaintiff must prove that the anticipated benefits of defendant's price depended on its tendency to discipline or eliminate competition and thereby enhance the firm's long-term ability to reap the benefits of monopoly power. If the defendant's prices were below average total cost but above average variable cost, the plaintiff bears the burden of showing defendant's pricing

**30.** Average total cost reflects that portion of the firm's total costs—both fixed and variable—attributable on an average basis to each unit of output. When the price of each unit equals or exceeds average total cost, the seller is recovering the total cost of production and is earning at least a "normal" rate of return on invested capital.

We emphasize that this case does not concern the possibility of proving predatory conduct when a defendant's prices equal or exceed average total cost—that is, when they are "profitable" in the economist's sense of the term. We express no opinion on the permissibility of such a claim.

**31.** Such conditions exist when the firm is producing below the level of output at which average total cost is minimized. *See* Areeda & Turner, *supra* note 19, at 710 & n.32.

**32.** Continuing production may be a rational loss-minimizing strategy even in this case if the firm has reason to believe "that the excess capacity is temporary and that the start-up costs incurred in the future when full-scale production resumes will be much greater if the firm ceases production now than if it stays in business even though not covering its variable costs." Jaskow & Klevorick, *supra* note 13, at 251 n.77. Of course, we express no view about the frequency with which this case occurs, nor do we foreclose the possibility of other legitimate justifications for a price below average variable cost. We hold only that the presumption of illegality created by proof of pricing below average variable cost is rebuttable.

was predatory. If, however, the plaintiff proves that the defendant's prices were below average variable cost, the plaintiff has established a prima facie case of predatory pricing and the burden shifts to the defendant to prove that the prices were justified without regard to any anticipated destructive effect they might have on competitors.

These holdings are not inconsistent with the results reached in *Hanson, Janich* and *CalComp*. *Hanson* and *Janich*, as already noted, upheld directed verdicts in favor of defendants because the plaintiffs had failed to introduce evidence of prices below marginal or average variable cost. However, in neither case was the plaintiff able to prove that the defendant had sacrificed greater profits or incurred greater losses than necessary, in order to eliminate the plaintiff.[33] In *CalComp* the plaintiff introduced neither direct evidence of predatory intent nor evidence of prices below average variable cost or average total cost.[34]

 In this case the district court granted Continental's motion for JNOV because it concluded that Inglis' evidence concerning Continental's cost-price relationship was legally insufficient to establish predatory pricing. Although Inglis' expert testified that during the period examined in his study Continental's prices were below average variable cost, the district court concluded that because excess capacity existed in the relevant market, only proof of prices below marginal cost could establish predatory pricing. The district court erred. The jury reasonably could have concluded that prices below average variable cost were predatory. Even when excess capacity exists, pricing below average variable cost, to repeat, is sufficiently questionable to support the inference that the prices were designed to eliminate competition.[35]

### 4. *How to Determine Which Costs Are Fixed and Which Are Variable*

We agree with the district court, however, that a new trial is in order. Inglis' principal evidence concerning the relationship between Continental's cost and prices consisted of average variable cost computations by its expert. These computations were based entirely on directions by Inglis' counsel as to which costs were to be considered variable and which fixed, directions which were derived from categories of cost mentioned in *Janich Bros., Inc. v. American Distilling Co., supra*, 570 F.2d at 858 & n.11. Inglis maintains that *Janich* allocated categories of cost as a matter of law and refers us to the recommendation of Professors Areeda and Turner that such categories be fixed to avoid case-by-case dispute.[36] We

---

**33.** Before the new pricing policy could get Hanson to the jury as a possible attempt to monopolize, Hanson had to establish that the new policy represented "predatory pricing" designed to drive competitors out of the market and establish monopoly benefits for Shell. This he has made no attempt to do.

... [F]or all that appears Shell's new pricing policies were nothing more than an attempt to gain a larger share of the market because of its stronger competitive position. *Hanson, supra*, 541 F.2d at 1358. Similarly, the *Janich* court found, *inter alia*, that the plaintiff had failed to introduce any evidence of actual sales below cost or evidence that the defendant's prices were not legitimate responses to competition. *See* 570 F.2d at 857.

We also note, for reasons previously mentioned, that neither *Pierce Packing Co. v. John Morrell & Co.*, 633 F.2d 1362 (9th Cir. 1980), nor *Murphy Tugboat Co. v. Crowley*, 658 F.2d 1256 (9th Cir. 1981), forecloses the result we reach today. *See* note 27 *supra*.

**34.** The *CalComp* opinion emphasized that the plaintiff had failed "to introduce any evidence to controvert IBM's substantial proof that its price cuts were highly profitable." 613 F.2d at 743.

**35.** The fact that a price is just sufficient to recover the cost of producing the marginal unit of output says nothing about whether that price, if charged across the board to all customers, will generate revenues sufficient to recover total costs or even out-of-pocket costs over the range of actual output. Only a comparison of price to average variable or average total cost can yield that answer. An excess capacity situation may justify average-variable-cost pricing, but it is unrealistic to say, even in that situation, that no price above marginal cost can be predatory.

**36.** Areeda and Turner advocate the arbitrary assignment of all costs to the variable cost category with the exception of capital costs, property and other taxes unaffected by output,

disagree with Inglis' interpretation of *Janich* and we reject the proposal of Professors Areeda and Turner.

*Janich* did not purport to describe categories of fixed and variable costs that were to apply in all predatory pricing cases. Rather, the cost items were listed as examples of costs that *typically* are variable and fixed. They should be read as illustrative and not prescriptive. To do otherwise would be to forget that the use of costprice comparisons is not an end in itself but a means of interpreting the likely justification for particular pricing decisions.

It is true, of course, that the fixed production costs of a firm are those costs that do not vary with output and that would remain even if the firm discontinued production. Likewise, variable costs, as the term suggests, are those costs that do vary with output and that the firm is likely to be most concerned with when contemplating a change in price and consequent changes in output. However, to determine whether particular costs are variable, one must evaluate the relationship of the prospective change in output to that level of output which presently exists. For example, some production decisions of great magnitude may entail the substantial retirement or expansion, as the case may be, of productive capacity, in which case costs typically considered fixed become variable. At the other extreme, small expansions of output may entail no change in costs, such as labor or

transportation, that are considered typically variable.[37]

In predatory pricing cases the relevant changes in output will be those attributable to the price reduction alleged to be predatory. The reduction of price in such a case no doubt will have resulted in an expansion of output to "clear the market," *i. e.*, to satisfy the increased demand generated by the price reduction. It is those costs that change as a result of the expanded output that appropriately are considered to be variable. Thus, the first step in determining average variable cost in a predatory pricing case will generally be to compare the costs of production before and after the price reduction. The variable costs would then be those expenses that increased as a result of the output expansion attributable to the price reduction. If the new price is below the average of these costs per unit of output there is good reason, as we have said, to infer that the price reduction was predatory.[38]

Price maintenance also may be predatory if other alternatives, such as higher prices and reduced output or terminating production altogether, would have been better means of minimizing losses. If these alternatives would have been considered by the firm as commercially reasonable, it would then be appropriate to consider them in identifying variable costs. Under such circumstances the variable cost items would be those that would have been

---

and depreciation of plant. 3 P. Areeda & D. Turner, *supra* note 25, ¶ 715c, at 173–74. The authors admit that this allocation includes "several elements that to varying degrees are really 'fixed,'" *id.* at 176, but defend it on the basis of administrative convenience and the otherwise relative permissiveness of their marginal cost rule, *id.* at 172–74.

**37.** The principal dispute in the trial court was whether expenses such as truck rental and wages for workers and drivers committed to the production and distribution of private label bread should be considered variable. Such costs were among those typically considered variable in *Janich*. Continental argued, however, that increased production of private label bread merely filled excess oven time and truck space already available and that the only cost items that properly could be considered varia-

ble were ingredients, wrappers, fuel, and salesmen's commissions. If these costs were the only ones that actually increased as a result of the price reduction, and if the prices were sufficient to recover them, then there is less reason to infer predation than Inglis maintains. Of course, as we discuss later it may be that Continental avoided other commercially reasonable means of minimizing losses that would have been more effective, and this fact would strengthen the inference of predation. However, we intimate no view on the accuracy of these assertions. They are proper subjects for investigation on remand.

**38.** The defendant must be allowed, however, to rebut this inference by proving nonpredatory reasons for the price alleged to be predatory.

reduced had the firm adopted another combination of output and price more effective in minimizing losses. These costs should be considered variable because they are costs that the firm had within its control at the time it established the price alleged to be predatory. Thus, an available but abjured course of conduct that would have reduced the amount of specifically identifiable unrecovered costs earmarks such cost items as variable. It is the average of these costs incurred per unit of output as a result of the course of action actually pursued by the producer that must be compared with the price of each unit.[39]

It follows that the determination of which costs are variable and which fixed will vary with the facts of each case. Moreover, cost categories are solely for the purpose of providing aid in answering the ultimate question: Did the justification for the defendant's price depend upon its anticipated destructive effect on competition or was the price justified as a reasonably calculated means of maximizing profits, minimizing losses, or achieving some other legitimate end? Accordingly, we hold that the determination of fixed and variable costs is a matter for the jury under appropriate instructions. In this case a new trial is warranted because the evidence upon which Inglis depended to prove predatory conduct was not based upon a calculation of which costs were fixed and which variable that was rooted in the particular facts of this case. We believe this disposition is also mandated by our recent decision in *Pierce Packing Co. v. John Morrell & Co.*, 633 F.2d 1362 (9th Cir. 1980).[40]

### C. *Other Evidence of Predation*

Inglis argues, however, that there was sufficient evidence of predatory conduct,

apart from proof of prices below average variable cost, to support the jury's verdict. Inglis did introduce evidence of prices below average total cost. We have already pointed out that, unless the plaintiff can prove that the prices were below average variable cost, it bears the burden of demonstrating that the anticipated benefits of defendant's pricing were dependent upon its tendency to discipline or eliminate competition and thereby enhance the defendant's ability to reap the benefits of monopoly power in the aftermath.

We note further that in examining whether this burden has been discharged, the courts must consider the evidence as a whole, giving plaintiffs "the full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each." *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699, 82 S.Ct. 1404, 1410, 8 L.Ed.2d 777 (1962). *See California Computer Products, Inc. v. IBM Corp., supra*, 613 F.2d at 746; *Sherman v. British Leyland Motors, Ltd.*, 601 F.2d 429, 450–51 & n.41 (9th Cir. 1979); *Lessig v. Tidewater Oil Co.*, 327 F.2d 459, 466 (9th Cir. 1964). Following this approach we cannot say that the district judge abused his discretion in ordering a new trial.

Inglis emphasizes the direct evidence of allegedly predatory intent that it introduced at trial. It primarily relies on a report prepared by McKinsey & Co., a management consulting firm commissioned by Continental to study the nationwide impact of private label sales on Continental's business and to recommend strategies of meeting the competition. This report suggested

---

**39.** Of course, average variable cost is not to be calculated by aggregating all cost items demonstrated to be variable under a range of plausible alternatives. By so aggregating all alternatives it would be possible to characterize all of the firm's costs as variable. Instead, the determination of which items of cost are to be considered variable must be accomplished by examining each alternative, one at a time, assuming that more than one reasonable loss-minimizing alternative existed.

**40.** In that decision we rejected a "contention that *Janich* adopted a rigid definition of those costs which may be considered in ascertaining fixed costs," and upheld the trial court's instruction that the determination of fixed costs was a question of fact for the jury. 633 F.2d at 1365.

three principal courses of action and then listed a dozen other issues that might be the subject of further study. One of these alternatives was to "maintain price to hasten wholesaler exit pace." There is no direct evidence in the record that any further action was taken on this proposal or that Continental ever considered or adopted it as a course of action.[41] The only available evidence indicates that the idea was "discussed" at meetings between McKinsey and Continental personnel in advance of the report's preparation, and nothing specifically suggests that it received any more interest than other alternatives. Finally, the proposal itself is consistent with the interpretation that it involved nothing more than reducing costs and profit margins to put pressure on less efficient bakeries. Nothing in the McKinsey report explicitly suggested that Continental incur losses in an attempt to eliminate competitors. Reasonably interpreted, it amounts to no more than a recommendation of intensified price competition.

The other evidence emphasized by Inglis adds little that would suggest unlawful intent. Inglis introduced semiannual sales reports prepared by Continental account executives in northern California which listed as target goals the acquisition of private label accounts currently held by Inglis. These reports add little to the evidence that Continental did in fact make competing offers to retailers served by Inglis. Equally inconclusive is documentary evidence that Continental personnel in northern California sought "market dominance." Considered as a whole, then, Inglis's evidence of intent is inconclusive. The district court did not abuse its discretion in ordering a new trial.

## III.

### THE ROBINSON–PATMAN ACT CLAIM

Appellant's Robinson-Patman Act claim was based substantially on the same facts underlying the attempt to monopolize claim. Inglis contended that price differentials between Continental's private label and advertised bread constituted price discrimination in violation of section 2(a) of the Clayton Act, as amended by the Robinson-Patman Act.[42] Inglis also identified (1) discrimination in the price of private label bread between California and Nevada and (2) discrimination in the price of advertised bread between California and Nevada.[43] The district court entered JNOV and, in the alternative, a new trial, in favor of Continental because it found that Inglis had failed to prove (1) the requisite effect on competition, and (2) causation.

### A. Competitive Injury

Because it is undisputed that throughout the complaint period Continen-

---

**41.** Of course, Inglis was not required to prove by direct evidence that Continental did adopt the McKinsey suggestions. But that fact cannot be inferred merely from evidence of prices below average total cost, and, in any case, illegal intent still would not be established without further proof that the prices were without legitimate business justification.

We decline to rule on the admissibility either of the McKinsey report, as Continental has urged, or on notes of ITT-Continental discussions prepared by Mr. Daniel of McKinsey, as Inglis appears to urge. Our discussion should not be construed as intimating any view on admissibility of either set of materials. Moreover, our evaluation of the evidence of predatory conduct is without consideration of the Daniel notes, which were excluded by the trial judge.

**42.** 15 U.S.C. § 13(a) (1976). Section 2(a) provides, in relevant part:

It shall be unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality, where either or any of the purchases involved in such discrimination are in commerce, . . . and where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them . . . .

**43.** The district court found, however, that these interstate differences in price were short-lived, involved *de minimis* amounts of sales, and thus could not have established the effect on competition required by § 2(a).

tal's advertised label prices were higher than its private label prices, "price discrimination," within the meaning of the statute, exists. Nothing more than a difference in price between commodities of like grade and quality is necessary to establish such discrimination.[44] *FTC v. Anheuser-Busch, Inc.*, 363 U.S. 536, 549–60, 80 S.Ct. 1267, 1274, 4 L.Ed.2d 1385 (1960). However, section 2(a) does not prohibit mere price discrimination. To be proscribed it must be shown that its effect "may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them." Inglis must prove that Continental's price discrimination produced a requisite effect on competition. *Janich Bros., Inc. v. American Distilling Co.*, 570 F.2d 848, 855 & n.6 (9th Cir. 1977), *cert. denied*, 439 U.S. 829, 99 S.Ct. 103, 58 L.Ed.2d 122 (1978); *Texas Gulf Sulphur Co. v. J. R. Simplot Co.*, 418 F.2d 793, 806 (9th Cir. 1969); *Balian Ice Cream Co. v. Arden Farms Co.*, 231 F.2d 356, 367, 368 (9th Cir. 1955), *cert. denied*, 350 U.S. 991, 76 S.Ct. 545, 100 L.Ed. 856 (1956).[45]

### 1. *Primary-Line Competition*

Section 2(a) is concerned with the protection of competition on several levels. Inglis' claim alleges adverse effects on so-called primary-line competition, *i. e.*, competition with the seller who has charged discriminatory prices.[46] A typical primary-line case involves a national manufacturer and distributor of products who lowers its price in a local market for the purpose of disciplining or eliminating local competitors, while maintaining higher prices in other, less competitive markets.[47] As the Supreme Court has noted, price discrimination of this sort was the impetus for the original enactment of section 2(a) of the Clayton Act in 1914. *FTC v. Anheuser-Busch, supra*, 363 U.S. at 543, 80 S.Ct. at 1271. The Robinson-Patman Act amendments, although principally concerned with so-called secondary-line competition between customers of the price discriminator, maintained the Clayton Act's focus on primary-line competition. *Id.* at 544, 546, 80 S.Ct. at 1271, 1272.

Courts consistently have held that the requisite effect on primary-line competition may be inferred from proof of predatory intent on the part of the price discriminator. *Utah Pie v. Continental Baking Co.*, 386 U.S. 685, 696–98, 87 S.Ct. 1326, 1332, 18 L.Ed.2d 406 (1967); *International Air Industries*, 517 F.2d 714, 722 (5th Cir. 1975), *cert. denied*, 424 U.S. 943, 96 S.Ct. 1411, 47 L.Ed.2d 349 (1976); *Continental Baking Co. v. Old Homestead Bread Co.*, 476 F.2d 97, 104 (10th Cir.), *cert. denied*, 414 U.S. 975, 94 S.Ct. 290, 38 L.Ed.2d 218 (1973); *Cornwell*

---

**44.** Continental does not dispute on appeal that its advertised and private label products were "commodities of like grade and quality," as required by § 2(a). We express no view on that subject.

**45.** *Accord, Chrysler Credit Corp. v. J. Truett Payne, Inc.*, 607 F.2d 1133, 1136 (5th Cir. 1979), *cert. granted*, 449 U.S. 819, 101 S.Ct. 70, 66 L.Ed.2d 21 (1980); *Continental Baking Co. v. Old Homestead Bread Co.*, 476 F.2d 97, 103 (10th Cir.), *cert. denied*, 414 U.S. 975, 94 S.Ct. 290, 38 L.Ed.2d 218 (1973); F. Rowe, Price Discrimination Under the Robinson-Patman Act § 5.6 (1962). *See United States v. United States Gypsum*, 438 U.S. 422, 450, 98 S.Ct. 2864, 2880 (1978); *FTC v. Anheuser-Busch, supra*, 363 U.S. at 550, 80 S.Ct. at 1275; *Corn Products Refining Co. v. FTC*, 324 U.S. 726, 738, 65 S.Ct. 961, 967, 89 L.Ed. 1320 (1945). *Contra, John B. Hull, Inc. v. Waterbury Petroleum Products, Inc.*, 588 F.2d 24, 28 (2d Cir.

1978), *cert. denied*, 440 U.S. 960, 99 S.Ct. 1502, 59 L.Ed.2d 773 (1979) (holding that proof of injury to competition is not part of plaintiff's prima facie case).

**46.** Section 2(a) also proscribes price discrimination with the requisite adverse effect on secondary-line competition (between customers of the price discriminator) and tertiary-line competition (between customers of the price discriminator's customers). In addition, the Supreme Court has identified a fourth level of competition within the ambit of § 2(a): competition between customers of the "favored" purchaser. *See Perkins v. Standard Oil Co.*, 395 U.S. 642, 89 S.Ct. 1871, 23 L.Ed.2d 599 (1969).

**47.** *See* F. Rowe, *supra* note 47, § 6.3; L. Sullivan, *supra* note 8, § 220, at 683.

*Quality Tools Co. v. C. T. S. Co.*, 446 F.2d 825, 831 (9th Cir. 1971), *cert. denied*, 404 U.S. 1049, 92 S.Ct. 715, 30 L.Ed.2d 740 (1972); *Balian Ice Cream, supra*, 231 F.2d at 369. And, as is true in suits alleging attempted monopolization under the Sherman Act, predatory intent may be inferred from proof of predatory conduct. *Utah Pie, supra*, 386 U.S. at 696 n.12, 87 S.Ct. at 1332, n.12; *International Air Industries, supra*, 517 F.2d at 722–23; *Cornwell Quality Tools, supra*, 446 F.2d at 831.[48]

### 2. Proof of Predatory Intent in Primary-Line Cases

In this case we confront the issue whether the principles set forth above in connection with proof of predatory intent in an attempt to monopolize claim pursuant to section 2 of the Sherman Act are equally applicable to proof of predatory intent in a primary-line Robinson-Patman Act suit. We hold that they are. We have previously recognized that where "a price differential threatens a primary line injury, . . . section 2 of the Sherman Act . . . and section 2(a) of the Clayton Act . . . are directed at the same economic evil and have the same substantive content." *Janich Bros., supra*, 570 F.2d at 855. *Accord, Pacific Engineering & Production Co. v. Kerr-McGee Corp.*, 551 F.2d 790, 798 (10th Cir.), *cert. denied*, 434 U.S. 879, 98 S.Ct. 234, 54 L.Ed.2d 160 (1977); *International Air Industries, supra*, 517 F.2d at 720 n.10. There exists no reason to establish principles for primary-line price discrimination cases different from those we recognized in attempt to monopolize cases.

It follows, therefore, that we disagree with the district court's holding that in its primary-line Robinson-Patman Act claim Inglis was required to prove that Continental's prices were below its marginal cost of production. A plaintiff may establish the required effects on competition in a primary-line case even though the defendant's prices were shown to be above marginal cost. However, unless the plaintiff proves that the prices were below the defendant's average variable cost, the plaintiff bears the burden of establishing that the anticipated benefits of the prices depended on their anticipated destructive effect on competition. If the plaintiff does prove pricing below average variable cost, the burden shifts to the defendant to establish a legitimate business justification for its conduct. Accordingly, we must reverse the district court's entry of JNOV.

However, no abuse of its discretion occurred when the trial court ordered a new trial on the Robinson-Patman Act claim. Although Inglis did establish that Continental's prices were in many instances below average total cost, it failed to establish by sufficient evidence either that Continental's prices were below average variable cost or that the benefits of Continental's prices depended on their anticipated tendency to eliminate competition. Finally, as we explained earlier, these deficiencies are not remedied by the direct evidence of intent offered by Inglis at trial.

---

**48.** In *Utah Pie*, a primary-line § 2(a) case, the Supreme Court stated that "a jury would be free to ascertain a seller's intent from surrounding economic circumstances, which would include persistent unprofitable sales below cost and drastic price cuts themselves discriminatory." 386 U.S. at 696 n.12, 87 S.Ct. at 1332 n.12. Inglis has relied strongly on this language in arguing that proof of Continental's pricing below average total cost is sufficient to sustain the jury's verdict. While we agree that in certain circumstances such proof will support the inference of predatory intent, we do not view *Utah Pie* as dispositive. Although the Court later referred to the defendant's prices as less than its "direct cost plus an allocation for overhead," *id.* at 698, 87 S.Ct. at 1333, there is no indication that the Court meant to establish

average total cost as the immutable dividing line in all Robinson-Patman Act cases. Indeed, in a case concerning § 3 of the Robinson-Patman Act, 15 U.S.C. § 13a (1976), which directly proscribes "unreasonably low prices," the Court held that not every sale below cost is illegal. "Such sales are not condemned when made in furtherance of a legitimate commercial objective, such as the liquidation of excess, obsolete or perishable merchandise, or the need to meet a lawful, equally low price of a competitor. . . . Sales below cost in these instances would be neither 'unreasonably low' nor made with predatory intent." *United States v. National Dairy Products Corp.*, 372 U.S. 29, 36–37, 83 S.Ct. 594, 599, 9 L.Ed.2d 561 (1963) (citations omitted).

3. *Sherman and Robinson-Patman Compared*

An injury to competition proscribed by section 2(a) of the Robinson-Patman Act perhaps may be established without proof of predatory intent or predatory pricing, however.[49] Therefore, we do not hold that there exists a complete substantive synchronization of the Sherman and Robinson-Patman Acts. However, no basis for establishing the requisite competitive injury, other than by proof of predatory intent and predatory pricing, is evident in the record before us, nor has Inglis argued one. Certainly, the mere fact that Inglis suffered losses and eventually ceased operations is not sufficient to establish a section 2(a) Robinson-Patman Act violation. In primary-line Robinson-Patman Act cases, such as is this one, the distinction between vigorous, but honest, price competition and predatory assaults on the competitive process is just as important as it is to Sherman Act cases brought under its section 2. Under these circumstances the analytical standards should be no different.

Two other differences between the substantive requirements of the Sherman and Robinson-Patman Acts should be mentioned, although neither alters the result of the case. First, the offense of attempted monopolization requires proof of a dangerous probability of success while section 2(a) of the Robinson-Patman Act requires only a showing that the price discrimination "may" substantially lessen competition. In this case, however, the distinction is of little significance. Without addressing the dispute about whether section 2(a) requires merely a "possibility" or a more substantial "probability" of competitive injury,[50] we agree with the Seventh Circuit that

[i]f [the defendant] is using its competitive power fairly in the market place and respecting the rights of its competitors, then no forecast of future adverse effects on competition based on those facts is valid. If, on the other hand, the projection is based on predatoriness or buccaneering, it can reasonably be forecast that an adverse effect on competition *may* occur.

*Anheuser-Busch, Inc. v. FTC*, 289 F.2d 835, 843 (7th Cir. 1961) (emphasis' in original). Thus, while we recognize that the language of the Robinson-Patman Act may afford somewhat more latitude than that of the Sherman Act, the difference in this case provides no basis for sustaining the jury's verdict.

The second difference lies in the scope of the competitive injury envisioned by the two statutes. While section 2 of the Sherman Act requires attempted monopolization of a "part" of commerce, and thus is concerned with competitive conditions generally in the line of commerce affected, section 2(a) of Robinson-Patman requires only an impermissible effect on competition by others with the seller employing discriminatory prices.[51] Once again, this difference does not alter our result here. Under either statute Inglis has failed to present sufficient evidence to sustain the jury's verdict.

B. *Causation*

The district court based its entry of judgment against Inglis on its Robinson-Patman Act claim on a second and independent ground. It held that Inglis was required to show that Continental subsidized the lower prices of its private label bread with the higher prices of its advertised bread. Such proof was necessary to establish a causal relationship between the price

---

**49.** *See International Air Industries, supra,* 517 F.2d at 722 n.14; *Continental Baking, supra,* 476 F.2d at 103–04; 1 ABA Antitrust Section, Monograph No. 4, The Robinson-Patman Act: Policy and Law 77 (1980); F. Rowe, *supra* note 47, §§ 7.3, 7.4; L. Sullivan, *supra* note 8, § 221; 4 J. von Kalinowski, Antitrust Laws and Trade Regulation § 29.03 (1979).

**50.** *See, e. g.,* 4 J. von Kalinowski, *supra* note 51, § 28.05.

**51.** *See, e. g.,* F. Rowe, *supra* note 47, § 6.3, at 122–23.

*discrimination* (and not merely the lower of the two prices) and any injury Inglis might have suffered. Finding no direct proof of subsidization, the district court held that Inglis could not draw the inference of subsidy without proof that Continental set prices below marginal cost.

We do not decide whether a showing of subsidization is necessary in a primary-line case, for we hold that even if such a requirement existed, the district court erred in refusing to permit the inference of subsidization except when the plaintiff can prove that the lower of the prices was below marginal cost. Our earlier discussion demonstrates that the marginal cost test does not capture the full range of economically questionable pricing activity, and that weakness condemns it in this context as well. The district court, therefore, erred in entering JNOV for Continental.

Continental has urged two additional grounds, which the district court either rejected or did not expressly address, for upholding the entry of JNOV in its favor. We turn now to those issues.

### C. *"In Commerce" Requirements*

Section 2(a) of the Robinson-Patman Act imposes three jurisdictional requirements relating to interstate commerce.[52] First, the alleged price discriminator must be "engaged in commerce." Second, the unlawful price discrimination must occur "in the course of such commerce." And third, "either or any of the purchases involved in such discrimination" must be "in commerce." These requirements delimit "both the universe of 'persons' who are subject to the Act and the type of transactions that can constitute a violation thereof." *S & M*

*Materials Co. v. Southern Stone Co.*, 612 F.2d 198, 200 (5th Cir.), *cert. denied*, 449 U.S. 832, 101 S.Ct. 101, 66 L.Ed.2d 37 (1980).

Only the third of these requirements is disputed in this case. We begin by noting that the jurisdictional reach of the Sherman Act is different from that of the Robinson-Patman Act. In enacting the Sherman Act Congress "wanted to go to the utmost extent of its Constitutional power in restraining trust and monopoly agreements." *United States v. South-Eastern Underwriters Ass'n*, 322 U.S. 533, 558, 64 S.Ct. 1162, 1176, 88 L.Ed. 1440 (1944). Accordingly, the Sherman Act consistently has been construed to reach anticompetitive activities that *affect* commerce. *E. g., Mandeville Island Farms v. American Crystal Sugar Co.*, 334 U.S. 219, 234, 68 S.Ct. 996, 1005, 92 L.Ed. 1328 (1948). In contrast, the Supreme Court has held that merely showing adverse effects on commerce will not satisfy the jurisdictional requirements of the Robinson-Patman Act. *Gulf Oil Corp. v. Copp Paving Co.*, 419 U.S. 186, 95 S.Ct. 392, 42 L.Ed.2d 378 (1974). Instead, the third requirement's language, "where either or any of the purchases involved in such discrimination are in commerce," means that section 2(a) applies only where " ' "at least one of the two transactions which, when compared, generate a discrimination . . . cross[es] a state line." ' " *Id.* at 200, 95 S.Ct. at 401 (quoting *Hiram Walker, Inc. v. A&S Tropical, Inc.*, 407 F.2d 4, 9 (5th Cir.), *cert. denied*, 396 U.S. 901, 90 S.Ct. 212, 24 L.Ed.2d 177 (1969) (quoting F. Rowe, Price Discrimination Under the Robinson-Patman Act 79 (1962)).[53] It is immaterial which one crossed a state line. As long as one or both did so, the jurisdictional re-

---

**52.** The relevant language of § 2(a) is as follows:
 It shall be unlawful for any person *engaged in commerce, in the course of such commerce,* . . . to discriminate in price between different purchasers . . . *where either or any of the purchases involved in such discrimination are in commerce* . . . .
 (Emphasis added.)

**53.** This rule was well established in the courts of appeals before the Supreme Court's decision in *Gulf Oil. See Littlejohn v. Shell Oil Co.*, 483 F.2d 1140, 1144 (5th Cir.) (en banc), *cert. de-*

*nied*, 414 U.S. 1116, 94 S.Ct. 849, 38 L.Ed.2d 743 (1973); *Cliff Food Stores, Inc. v. Kroger, Inc.*, 417 F.2d 203, 208–09 (5th Cir. 1969); *Hiram Walker, Inc. v. A&S Tropical, Inc.*, 407 F.2d 4, 9 (5th Cir.), *cert. denied*, 396 U.S. 901, 90 S.Ct. 212, 24 L.Ed.2d 177 (1969); *Willard Dairy Corp. v. National Dairy Products Corp.*, 309 F.2d 943, 946 (6th Cir. 1962), *cert. denied*, 373 U.S. 934, 83 S.Ct. 1534, 10 L.Ed.2d 691 (1963); *Mayer Paving & Asphalt Co. v. General Dynamics Corp.*, 486 F.2d 763, 766 (7th Cir. 1973), *cert. denied*, 414 U.S. 1146, 94 S.Ct. 899, 39

quirement is satisfied. *See, e. g., Moore v. Mead's Fine Bread Co.*, 348 U.S. 115, 120, 75 S.Ct. 148, 150, 99 L.Ed. 145 (1954).

 Continental argues that Inglis has failed to satisfy this jurisdictional requirement. Although the district court found that Continental's interstate transactions constituted a small percentage of its total sales in the region, these transactions were sufficient "to bring the whole panoply of alleged intrastate price discriminations within the subject matter jurisdiction requirements of Robinson-Patman § 2(a)." 461 F.Supp. at 420–21. The great bulk of both advertised and private label bread sales from Continental's three northern California plants occurred within California; nevertheless, it did sell both private label and advertised bread to accounts in Nevada. Moreover, the prices for those products generally were higher than the prices for their California counterparts, at least until 1973. In addition, the central price disparity identified by Inglis—that between the advertised and private label bread—was reflected in the interstate sales. That is, Continental's advertised prices in Nevada were nearly always higher than private label prices in California, and its advertised prices in California were higher than its private label prices in Nevada.

 Denying none of these facts, Continental argues that the interstate sales

L.Ed.2d 102 (1974); *Borden Co. v. FTC*, 339 F.2d 953, 955 (7th Cir. 1964); *Belliston v. Texaco, Inc.*, 455 F.2d 175, 178 (10th Cir.), *cert. denied*, 408 U.S. 928, 92 S.Ct. 2494, 33 L.Ed.2d 341 (1972).

54. The district court agreed with Continental that its Nevada sales were *de minimis*, when compared to Continental's total sales from its northern California bakeries. 461 F.Supp. at 420. The court's holding, however, was in the context of an analysis that segmented the market and then found the Nevada sales to be too insignificant to substantiate the claimed adverse effect on competition required by § 2(a). Examining those sales alone, we agree with the district court. However, in determining whether Continental's price discrimination had the required effect on competition, all of the discriminatory sales, both in Nevada and California, must be examined. The effect on competition of the price discrimination of either Nevada or California sales alone is a different ques-

involved *de minimis* amounts and thus will not support Robinson-Patman Act jurisdiction.[54] We reject Continental's position. We cannot ignore that Continental sold its bread in an interstate market area and that some of the sales which demonstrated a price discrimination occurred across state lines. Nothing in the language or legislative history of the Robinson-Patman Act indicates that some prescribed quantum of interstate transactions is necessary for jurisdiction to attach. Since the price disparity between advertised and private label bread, about which Inglis complains, was represented by some interstate sales, we affirm the district court's holding that it had jurisdiction to examine that same price disparity as it existed with respect to sales of the same products within California. *See Continental Baking Co. v. Old Homestead Bread Co.*, 476 F.2d 97, 109 (10th Cir.), *cert. denied*, 414 U.S. 975, 94 S.Ct. 290, 38 L.Ed.2d 218 (1973); *Dean Milk Co. v. FTC*, 395 F.2d 696, 715 (7th Cir. 1968). This is not a case in which jurisdiction is being asserted over essentially local transactions, involving purely local businesses, wholly because a few incidental or unrelated interstate sales were made.

### D. Meeting Competition

 Continental's final ground for asserting that we should affirm the district

tion from the issue of jurisdiction. Although some courts have applied a *de minimis* principle to the jurisdictional aspect of § 2(a), *see Food Basket, Inc. v. Albertson's, Inc.*, 383 F.2d 785, 788 (10th Cir. 1967); *Zoslow v. Columbia Broadcasting System, Inc.*, 1977–2 Trade Cas. ¶ 61,756, at 73,126 (N.D.Cal.1976); *Baldwin Hills Building Material Co. v. Fibreboard Paper Products Corp.*, 283 F.Supp. 202, 204–05 (C.D. Cal.1968), they have done so when the interstate sales were merely inadvertent or incidental to defendant's basically intrastate business. However, when the defendant is an interstate corporation engaged in a multistate marketing operation, interstate sales made in the course of that operation and involving the same products and price differentials as are found in defendant's intrastate transactions, are sufficient to establish jurisdiction, even when those sales are insignificant in relation to the total sales under examination.

court's entry of JNOV on the Robinson-Patman Act claim is that its pricing was a good faith effort to meet price competition. Section 2(b) of the Act, 15 U.S.C. § 13(b), provides for this affirmative defense. It permits the defendant to establish that its lower price "to any purchaser or purchasers was made in good faith to meet an equally low price of a competitor." Such a showing provides an absolute defense to a charge of violating section 2(a). *Standard Oil Co. v. FTC*, 340 U.S. 231, 71 S.Ct. 240, 95 L.Ed. 239 (1951); *Cadigan v. Texaco, Inc.*, 492 F.2d 383, 386 (9th Cir. 1974). Continental argues that it established this defense. The district court did not discuss the question because it granted JNOV on other grounds. Its near equivalent was discussed, however. The California Unfair Practices Act provides a similar "meeting competition" defense. The district court, in ordering a new trial on the claim based on this Act, found that the *weight of the evidence* established that Continental maintained its private label prices in a good faith response to competition. To employ the meeting competition defense as an additional ground for JNOV on the Robinson-Patman Act claim, Continental must establish that the *evidence supported only one reasonable conclusion*—that its lower prices were a good faith response to competition. *E. g., Fount-Wip, Inc. v. Reddi-Wip, Inc.*, 568 F.2d 1296, 1300 (9th Cir. 1978). Although we agree with the district court that the weight of the evidence supports this defense, we conclude Continental has not satisfied the more demanding requirement for JNOV.

As the Supreme Court stated in its recent decision in *Great Atlantic & Pacific Tea Co. v. FTC*, 440 U.S. 69, 82–83, 99 S.Ct. 925, 934, 59 L.Ed.2d 153 (1979),

> The test for determining when a seller has a valid meeting-competition defense is whether a seller can "show the existence of facts which would lead a reasonable and prudent person to believe that the granting of a lower price would in fact meet the equally low price of a competitor." *FTC v. A.E. Staley Mfg. Co.*, 324 U.S. 746, 759–60 [65 S.Ct. 971, 977, 89 L.Ed. 1338]. "A good-faith belief, rather than absolute certainty, that a price concession is being offered to meet an equally low price offered by a competitor is sufficient to satisfy the § 2(b) defense." *United States v. United States Gypsum Co.*, 438 U.S. 422, 453 [98 S.Ct. 2864, 57 L.Ed. 854]. Since good faith, rather than absolute certainty, is the touchstone of the meeting-competition defense, a seller can assert the defense even if it has unknowingly made a bid that in fact not only met but beat his competition. *Id.*, at 454 [98 S.Ct. at 2882].

Continental maintains that its reductions in the price of private label bread were made in response to equally low prices offered principally by American and Campbell-Taggart. Inglis challenges the good faith of Continental's behavior by emphasizing two related features of the price reductions. First, when Continental reduced its price to one customer in response to a competitive offer, it made that price available throughout the market, Second, in contrast to its practice with respect to price discounts for its advertised bread, Continental made no attempt to verify that each of the buyers to whom Continental offered its lower price had actually received an equally low offer from a competitor.

Although the Robinson-Patman Act "places emphasis on individual competitive situations, rather than upon a general system of competition," *FTC v. A.E. Staley Manufacturing Co.*, 324 U.S. 746, 753, 65 S.Ct. 971, 974, 89 L.Ed. 1338 (1945), we are not convinced that market-wide price reductions are fatal to the defense in all instances. Rather, section 2(b) "permits the justification of a seller's lower prices which are granted not only to particular customers tempted by competitive prices, but which respond in a given area by blanket price reductions co-extensive with the price competition to be met." F. Rowe, Price Discrimination Under the Robinson-Patman Act, § 9.7, at 239 (1962). *Accord, Callaway Mills Co. v. FTC*, 362 F.2d 435 (5th Cir. 1966); *Balian Ice Cream Co. v. Arden Farms Co.*, 231 F.2d 356, 366–67 (9th Cir. 1955), *cert. denied*, 350 U.S. 991, 176 S.Ct.

545, 100 L.Ed. 856 (1956). But the price competition zone cannot be perceived to be smaller than the zone of price reduction. That is, a defendant may not use the existence of a competitive offer to one of its customers as an excuse aggressively to reduce prices to others when it has no reasonable basis to believe that competitors are extending similar offers throughout the market. But when grounds for such a belief do exist, section 2(b) may permit market-wide reductions. Also, the defense is not forfeited simply because the defendant has sought to gain new customers with a lower price, as well as retain old ones tempted by competitive offers. *International Air Industries, Inc. v. American Excelsior Co.*, 517 F.2d 714, 726 (5th Cir. 1975), *cert. denied*, 424 U.S. 943, 96 S.Ct. 1411, 47 L.Ed.2d 349 (1976); *Cadigan v. Texaco, Inc.*, *supra*, 492 F.2d at 387; *Hanson v. Pittsburgh Plate Glass Industries, Inc.*, 482 F.2d 220, 226–27 (5th Cir. 1973), *cert. denied*, 414 U.S. 1136, 94 S.Ct. 80, 38 L.Ed.2d 761 (1974); *Sunshine Biscuits, Inc. v. FTC*, 306 F.2d 48, 51–52 (7th Cir. 1962).

■ The proper principle is reasonably clear. Marketwide price reductions are permissible when there is a reasonable basis to believe that equally low offers are available from competitors throughout the market. As the Supreme Court has emphasized, the touchstone must be the good faith and reasonableness of the defendant's belief. *United States v. United States Gypsum*, *supra*, 438 U.S. at 453–55, 98 S.Ct. at 2881. Under the circumstances of this case, we cannot say that the defense is unavailable. The defendant knew of competitive prices actually available throughout the market, even though it did not document, with the rigor for which Inglis argues, that each buyer received specific offers from competitors. *See FTC v. Standard Oil Co.*, 355 U.S. 396, 404, 78 S.Ct. 369, 373, 2 L.Ed.2d 359 (1958); *International Air Industries, supra; Hanson v. Pittsburgh Plate Glass, supra; Callaway Mills, supra*.

■ The market for private label bread in northern California during the complaint period was intensely competitive. Continental operated on the assumption that once a new price became available to one buyer, it would quickly, if not immediately, become available to all buyers in the market. This assumption was shared by other competitors, and was supported by experience. Private label bread was sold to large chain grocery stores. Thus, although the volume of loaves sold was large for any given private label account, the number of these accounts was comparatively small. In contrast, advertised bread was sold not only to the chain stores but to a much larger number of small markets and corner groceries, each of whom accounted for only a small portion of total sales.

As indicated above, Continental proceeded quite differently with respect to price reductions of the two types of bread. It used a costly and rigorous method of verifying that any discount in the price of advertised bread was offered in response to equally low discounts offered by competitors.[55] No similar procedure was used in offering price reductions to private label customers.[56] The record, however, indicates

**55.** Each buyer who represented to Continental that he had received a competitive offer was required to so state in writing or in the presence of witnesses. A form was then completed which required the signatures not only of the route salesman who had received notice of the competitive offer from the purchaser, but of the general manager of the bakery serving that customer, the regional vice-president, the regional comptroller, the divisional vice-president, and a member of Continental's legal department. Only then would Continental extend a price discount on its advertised bread to the buyer. This procedure was employed regardless of the size of the discount or the size of the purchase to which the discount applied. Moreover, the discount was limited to the customer whose report of a competitive offer had been verified.

**56.** The record indicates that Continental did verify that certain of its accounts had received offers of price discounts from competitors. This was accomplished through personal conversations between Continental's regional vice-president and buyers from its private label accounts. Continental maintains that it was unnecessary to use the formal verification procedures normally used for advertised label price discounts. In the case of private label

that Continental did not initiate either of the significant price reductions that occurred during the complaint period. The first market-wide price reduction, which occurred in 1969, apparently was initiated by Campbell-Taggart's offer of 18 cents per loaf to the Albertson's chain. This news spread throughout the market and the rest of the private label competitors, including Continental, followed suit.[57] The second price reduction, from 18 cents to 17.2 cents, which occurred in the summer of 1972, was the result of the following chain of events. The buyer for the Mayfair chain, which was one of Continental's largest private label accounts, notified Continental personnel that it had received an offer of 17.2 cents for the one-pound loaf from American. Continental's regional vice-president confirmed this report in a discussion with the Mayfair buyer. He then contacted the buyer for Cala Foods, another Continental private label account, and learned that it too had received a 17.2 cent offer from American. After consulting with Continental's general counsel in New York, the regional vice-president authorized a Continental price reduction to 17.2 cents. According to Continental's policy, this price was made available not only to Mayfair and Cala Foods, but also to the remainder of Continental's private label accounts and to prospective purchasers served by other bakeries, including Inglis. The record indicates that American had in fact made 17.2 cent offers to the two Continental accounts. American's regional manager, on the other hand, testified that this price reduction was prompted by a 17.2 cent offer made by Campbell-Taggart to American's Food Fair account, an offer which American assumed was, or would soon become, the market price.

This reveals much about the way the market for private label bread operated during the complaint period. Although the record does not always identify which of Continental's competitors initiated a price reduction, it does reveal how a price reduction to one customer quickly became the prevailing market price. Each bakery ignored this new price at its peril. Because the number of private label accounts was not large, buyers for those accounts communicated with each other and with all of the wholesale bakeries. Price reductions to one account did not long remain secret. We conclude, therefore, that there was a reasonable basis for Continental's assumption that a new price offered to one of its accounts by a competitor, which Continental did verify, would become available, with or without its assistance, to all of its existing and prospective customers. The weight of the evidence supports Continental's claim that its price reductions were good faith responses to competition. There was no need for Continental to verify that each customer had actually received a competitor's offer of an equally low price, as it did in the case of advertised bread.

█ Nevertheless, we cannot say that this was the only reasonable conclusion possible. We believe it to be the most reasonable but we cannot go the extra step. We must therefore reject Continental's argument in support of JNOV. There remains the fact that Continental's failure to employ verification procedures in the private label market is not inconsistent with the type of aggressive price reductions condemned by the Robinson-Patman Act. Given the smaller number of private label

---

discounts, fewer accounts were involved and communications between Continental and the chain stores involved persons in higher levels of the managerial hierarchy in both organizations than normally occurred in the case of advertised label discounts. Continental apparently believed that these conversations provided a more reliable basis for verifying that competitive offers had occurred, and thus that formal documentation was unnecessary. Nevertheless, once Continental had verified that some of its accounts had received competitive

offers, it extended equally low offers not only to those accounts, but to other existing and potential customers without verifying that they too had actually received competitive offers.

**57.** Other grocery stores and bakeries apparently learned of the 18-cent offer from copies of Campbell-Taggart's letter to Albertson's confirming the offer. The record does not indicate how the letter became public or how it was circulated.

accounts, documentation of competitive offers for those accounts would have been easier than verification for advertised label reductions. Our admittedly small doubt nonetheless precludes our acceptance of Continental's argument that JNOV was warranted because it established the meeting competition defense.

## IV.

### THE CALIFORNIA UNFAIR PRACTICES ACT CLAIM

The jury's finding of a violation of the California Unfair Practices Act, Cal.Bus. & Prof.Code §§ 17000–17101, was based on Continental's selling bread below cost with the purpose of injuring competitors or destroying competition during the periods October 1, 1970, through February 1, 1972, and February 7, 1976, through April 6, 1976.[58] The district court granted Continental's motion for JNOV with respect to alleged violations within the later period on the ground that Inglis failed to show that Continental's prices during that period were below cost as that term is defined in the California statute. Inglis does not challenge this ruling on appeal. The district court, however, did find that Inglis had produced sufficient evidence of below-cost sales for the earlier period. Nonetheless, consistent with the result reached with respect to other analogous claims, Continental's motion for a new trial was granted because it had established by weight of the evidence that its prices were a good faith response to competition.

Inglis appeals from the district court's order for a new trial and Continental seeks to overturn the court's denial of its motion for JNOV with respect to alleged violations between October 1970 and February 1972. We turn first to Continental's arguments in support of JNOV.

### A. Continental's Appeal: The Preemption Issue

Continental's principal argument is that California's statute is preempted by the federal antitrust laws. We disagree. Section 17043 of the statute makes it unlawful "to sell any article or product at less than the cost thereof to the vendor ... for the purpose of injuring competitors or destroying competition." The statute defines "cost" to include virtually all variable and fixed costs of the business. Cal.Bus. & Prof.Code §§ 17026, 17029.[59] Thus, the California statute essentially proscribes pricing below what we have described as average total cost for the purpose of injuring competitors or destroying competition.

Continental argues that this standard conflicts with this circuit's interpretation of the federal antitrust laws, which permits pricing under appropriate circumstances at or above marginal or average variable cost. It does not contend that compliance with California law requires conduct that would violate federal antitrust laws. Rather, it argues that the California law *proscribes* conduct which federal law *permits* and, in so doing, frustrates the fundamental poli-

---

**58.** Because the district court applied a one-year statute of limitations, an action the parties do not dispute, the state law claim applied to only two periods, one dating from Inglis' filing of its original and first amended complaint, and the other from the filing of its supplemental complaint. As we discuss *infra*, the gap between the two periods was the result of the district court's refusal to allow the supplemental complaint to "relate back" to the date of the first amended complaint.

**59.** Section 17026 provides, in relevant part: " 'Cost' as applied to production includes the cost of raw materials, labor and all overhead expenses of the producer." Section 17029 defines "overhead expense" as

all costs of doing business incurred in the conduct of the business and shall include without limitation the following items of expense: labor (including salaries of executives and officers), rent, interest on borrowed capital, depreciation, selling cost, maintenance of equipment, delivery costs, credit losses, all type of licenses, taxes, insurance and advertising.

In addition, § 17073 provides, in relevant part:

Proof of average overall cost of doing business for any particular inventory period when added to the cost of production of each article or product, as to a producer, ... is presumptive evidence of cost of each article or product involved in any action brought under this chapter.

cies of the Sherman Act.[60] We are not convinced.

First, the possibility of proscription by California of conduct that federal law might permit is not sufficient to warrant preemption. *Exxon Corp. v. Governor of Maryland*, 437 U.S. 117, 131, 98 S.Ct. 2207, 2216, 57 L.Ed.2d 91 (1978); *Shell Oil Co. v. Younger*, 587 F.2d 34, 36 (9th Cir. 1978) (per curiam). The fact that we have established an evidentiary standard, which does not make all pricing below average total cost indicative of anticompetitive intent, does not create a federal *right* to set such prices.

Second, any conflict between state and federal law, on the facts of this case, is entirely speculative. The California statute does not make all sales below average total cost illegal *per se*. Instead, such sales must have been made "for the purpose of injuring competitors or destroying competition." Cal.Bus. & Prof.Code § 17043; *Hladek v. City of Merced*, 69 Cal.App.3d 585, 591, 138 Cal.Rptr. 194, 198 (1977); *Page v. Bakersfield Uniform & Towel Supply Co.*, 239 Cal. App.2d 762, 770, 49 Cal.Rptr. 46, 51 (1966); *Sandler v. Gordon*, 94 Cal.App.2d 254, 258, 210 P.2d 314, 317 (1949). The statute enables a plaintiff to create a presumption of unlawful purpose by introducing evidence of sales below cost plus proof of injury to competitors or competition. Cal.Bus. & Prof.Code § 17071.[61] However, this presumption may be rebutted by establishing one of the statute's affirmative defenses, such as meeting competition, see Cal.Bus. & Prof.Code § 17050, or by showing that the sales "were made in good faith and not for the purpose of injuring competitors or destroying competition." *People v. Pay Less Drug Stores*, 25 Cal.2d 108, 114, 153 P.2d 9, 12–13 (1944).

The only real difference between the California statute and federal law is in the allocation of evidentiary burdens. Assuming proof of injury to a competitor has been made, California law allows plaintiffs to establish a prima facie case with proof of prices below average total cost. The defendant then has the burden of negating the inference of illegal intent or of establishing an affirmative defense. Under federal law, a plaintiff who relies on prices below average total cost, but above average variable cost, has not created a presumption of illegal intent. To establish such a presumption he must show that no legitimate business reason for the below-cost price exists. It follows, therefore, that a price below average total cost but above average

---

**60.** As the Supreme Court has recently reaffirmed, even if Congress has not completely foreclosed state legislation in a particular area, a state statute is void to the extent that it actually conflicts with a valid federal statute. A conflict will be found "where compliance with both federal and state regulations is a physical impossibility ...," *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142–143 [83 S.Ct. 1210, 1217, 10 L.Ed.2d 248] (1963), or where the state "law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines v. Davidowitz*, 312 U.S. 52, 67 [61 S.Ct. 399, 404, 85 L.Ed. 581 (1951)
...
*Ray v. Atlantic Richfield Co.*, 435 U.S. 151, 158, 98 S.Ct. 988, 994, 55 L.Ed.2d 179 (1978). "This inquiry requires us to consider the relationship between state and federal laws as they are interpreted and applied, not merely as they are written." Jones v. Rath Packing Co., 430 U.S. 519, 526, 97 S.Ct. 1305, 1310, 51 L.Ed.2d 604 (1977). However, federal courts are "generally reluctant to infer preemption" and must scrupulously avoid " 'seeking out conflicts between

state and federal regulation where none clearly exists.' " *Exxon Corp. v. Governor of Maryland*, 437 U.S. 117, 130, 132, 98 S.Ct. 2207, 2216, 2217, 57 L.Ed.2d 91 (1978) (quoting *Huron Portland Cement Co. v. Detroit*, 362 U.S. 440, 446, 80 S.Ct. 813, 817, 4 L.Ed.2d 852 (1960)).

**61.** Section 17071 provides:
In all actions brought under this chapter proof of one or more acts of selling or giving away any article or product below cost or at discriminatory prices, together with proof of the injurious effect of such acts, is presumptive evidence of the purpose or intent to injure competitors or destroy competition. Although the statute does not define "injurious effect," evidence of which is necessary to raise the presumption, the California courts have interpreted it to mean "injury to a competitor or destruction of competition," consistent with the language of § 17043. *People v. Pay Less Drug Stores*, 25 Cal.2d 108, 113, 153 P.2d 9, 12 (1944).

variable cost does not always violate California law, nor is such a price a guarantee of immunity under federal law. The difference between the two laws does not warrant the inference of preemption.[62]

### B. *Inglis' Appeal: The Meeting Competition Issue*

██ The district court found that Continental had met the requirements of the defense of meeting competition by the weight of the evidence, and accordingly ordered a new trial on the Unfair Practices Act claim.[63] For the same reasons set forth in our discussion of the Robinson-Patman Act, we also believe that with respect to this defense the district court did not abuse its discretion. Therefore, we reject Inglis' appeal as well as Continental's claim that

the evidence was sufficient to justify JNOV.[64]

## V.

### DAMAGES

The jury returned a judgment of $5,048,000 against Continental, based on both the federal and state law claims. The district court found this excessive in light of the evidence and awarded a new trial. As an alternative ground for its order, the court found that the jury's attribution of Inglis' losses to Continental was also against the weight of the evidence. The court determined that other causal factors significantly contributed to Inglis' injury.

Because we agree that a new trial on the question of liability is required, we need not

---

**62.** The inference of preemption is especially inappropriate because the basic purposes of the state and federal statutes are similar. *See Exxon Corp. v. Governor of Maryland, supra,* 437 U.S. at 132–33, 98 S.Ct. at 2217. The California statute was designed to "safeguard the public against the creation or perpetuation of monopolies and to foster and encourage competition." Cal.Bus. & Prof.Code § 17001 (West 1964) (statement of legislative purpose); *Harris v. Capitol Records Distributing Corp.,* 64 Cal.2d 454, 461, 413 P.2d 139, 144, 50 Cal.Rptr. 539, 544 (1966). The purposes of the Sherman Act hardly could be stated more succinctly. Even if, as Continental contends, California's means of pursuing this end has a dampening effect on price competition, this does not warrant preemption. "For if an adverse effect on competition were, in and of itself, enough to render a state statute invalid, the States' power to engage in economic regulation would be effectively destroyed." *Exxon Corp. v. Governor of Maryland, supra,* 437 U.S. at 133, 98 S.Ct. at 2217; *New Motor Vehicle Board v. Orrin W. Fox Co.,* 439 U.S. 96, 110–11, 99 S.Ct. 403, 412, 58 L.Ed.2d 361 (1978).

*Murphy Tugboat Co. v. Crowley,* 454 F.Supp. 847 (N.D.Cal.1978), does not persuade us to reach a different result. That case concerned solely the permissibility of a particular measure of damages; the court assumed the existence of liability. *Id.* at 850. One of the questions was whether plaintiff could recover lost revenues caused by defendant's assumed failure to raise its prices above fully allocated costs, as required by § 17043 of the California Unfair Practices Act. The district court held that this measure of damages "would tend to inhibit and penalize the legitimate price competition sought by the Sherman Act to such an extent that it cannot be permitted." *Id.* at 858. The

court was careful to note that its decision should not be taken as a ruling on the validity of the California statute, which is the only question we have considered.

**63.** Section 17050 provides, in relevant part:

The prohibitions of this chapter against locality discriminations, sales below cost, and loss leaders do not apply to any sale made:

. . . .

(d) In an endeavor made in good faith to meet the legal prices of a competitor selling the same article or product, in the same locality or trade area and in the ordinary channels of trade.

(e) In an endeavor made in good faith by a manufacturer, selling an article or product of his own manufacture, in a transaction and sale to a wholesaler or retailer for resale to meet the legal prices of a competitor selling the same or a similar or comparable article or product, in the same locality or trade area and in the ordinary channels of trade.

To the extent that the California "meeting-competition" defense differs from § 2(b) of the Robinson-Patman Act, those differences do not alter our conclusion in this case.

**64.** Continental also argues that JNOV was justified because Inglis allegedly failed to prove that Continental's prices were intended to "injur[e] competitors or destroy[] competition." Although such proof is necessary to plaintiff's prima facie case under § 17043, we do not find that Inglis' proof was so insufficient that JNOV was warranted, especially in light of § 17071, which establishes a presumption of illegal intent once plaintiff has introduced both evidence of prices below fully allocated cost and proof of economic injury.

consider whether the district court erred in finding the amount of damages excessive. However, Continental argues that the lack of evidence on causation is a sufficient alternative ground for judgment in its favor on both the federal and state claims. This contention requires our attention. We disagree with Continental's position.

## A. *Causation*

 To establish a cause of action for damages under section 4 of the Clayton Act, 15 U.S.C. § 15, an essential element of recovery is proof of cognizable injury attributable to the defendant's unlawful conduct. *Chrysler Credit Corp. v. J. Truett Payne, Inc.*, 607 F.2d 1133, 1135 (5th Cir. 1979), *cert. granted*, 449 U.S. 819, 101 S.Ct. 70, 66 L.Ed.2d 20 (1980); *Gray v. Shell Oil Co.*, 469 F.2d 742, 748–49 (9th Cir. 1972), *cert. denied*, 412 U.S. 943, 93 S.Ct. 2773, 37 L.Ed.2d 403 (1973). This requirement is often characterized as the burden of showing the *fact* of antitrust injury, as distinguished from the *amount* of damages. *See, e. g., Story Parchment Co. v. Paterson*, 282 U.S. 555, 562, 51 S.Ct. 248, 250, 75 L.Ed. 544 (1931). The plaintiff, this court has said, must "establish with reasonable probability, the existence of some causal connection between defendant's wrongful act and some loss of anticipated revenue." *Flintkote Co. v. Lysfjord*, 246 F.2d 368, 392 (9th Cir. 1957); *Pacific Coast Agricultural Export Ass'n v. Sunkist Growers, Inc.*, 526 F.2d 1196, 1205–06 (9th Cir. 1975), *cert. denied*, 425 U.S. 959, 96 S.Ct. 1741, 48 L.Ed.2d 204 (1976). "It is enough that the illegality is shown to be a material cause of the injury; a plaintiff need not exhaust all possible alternative sources of injury in fulfilling his burden of proving compensable injury under § 4." *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 114 n.9, 89 S.Ct. 1562, 1571 n.9, 23 L.Ed.2d 129 (1969). Continental introduced evidence, which the district court credited in ordering a new trial, showing the existence of factors other than its own pricing activity which contributed to Inglis' failure as a business. The only issue before us now is whether Inglis' evidence of causation was so meager as to warrant entry of judgment for Continental. Inglis' demise was, in our view of the record, the result of a confluence of factors. In such circumstances it is difficult to identify precisely the extent to which the failure was the result of allegedly illegal conduct. However, the law does not require precision in this area. Continental's pricing need only have been a material cause of Inglis' decline, and causation may be inferred if Inglis' injury was "the type of loss that the claimed violations of the antitrust laws would be likely to cause." *Zenith Radio Corp.*, supra, 395 U.S. at 125, 89 S.Ct. at 1577; *Mt. Hood Stages, Inc. v. Greyhound Corp.*, 555 F.2d 687, 701 (9th Cir. 1977), *vacated on other grounds*, 437 U.S. 322, 98 S.Ct. 2370, 57 L.Ed.2d 239 (1978). Without intimating our views on the weight of the evidence, we are satisfied that measured against our standards Inglis introduced sufficient evidence of causation to withstand a motion for JNOV by Continental.

## B. *The "Before and After" Damage Theory*

As we stated earlier, it is not now necessary to determine whether the damage award was supported by the evidence. Inglis argues staunchly, however, that the district court erred in excluding evidence that compared its profitability during a "base period" with that during the "liability period." We decline to pass on this issue.

 We hasten to acknowledge that were we convinced that the issue Inglis presents had a simple answer unquestionably applicable on retrial of this case we would provide that answer in the interest of expediting the proper disposition. Unfortunately, we are not so convinced. Therefore, we can only point out that while the jury is entitled to make "a just and reasonable estimate of damage based on relevant data," *Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 264, 66 S.Ct. 574, 579, 90 L.Ed.2d 652 (1946), it is not entitled to "render a verdict based on speculation or guesswork," *id.* To qualify as an "esti-

mate" and avoid a characterization as "speculation," it is necessary to show that the market conditions of both the "base" and "liability" periods "were similar but for the impact of the violation." *Pacific Coast Agricultural Export Ass'n, supra*, 526 F.2d at 1207. Further comment at this time we believe to be both unnecessary and unwise.

## VI.

### OTHER ISSUES

Although we have decided to affirm the district court's order of a new trial as to those claims actually presented to the jury, two issues yet remain. The first concerns the district court's entry of summary judgment against Inglis on its "vertical" conspiracy claim. The second concerns the court's application of the statute of limitations to Inglis' supplemental complaint. Our resolution of these issues is necessary because it will affect the scope of a new trial.

### A. *The Sherman Act Conspiracy Claims*

As previously noted, Inglis' original complaint, as well as its first amended complaint, included allegations that Continental conspired with named defendants American and Campbell-Taggert, and with third parties, whose identity was then unknown, to restrain trade in violation of section 1 of the Sherman Act, 15 U.S.C. § 1,[65] and to monopolize in violation of section 2 of the Sherman Act. Shortly before trial, Inglis identified the previously unnamed cocon-spirators as Continental's parent company, ITT, and the management consulting firm of McKinsey & Co. Thereafter, the district court granted summary judgment for Continental on the conspiracy claim involving Continental, ITT, and McKinsey.[66] We affirm the district court's entry of judgment on the alleged conspiracy between Continental and McKinsey, but reverse with respect to the conspiracy between Continental and ITT.[67]

#### 1. *The Timeliness of Inglis' Allegations*

Continental's motions for summary judgment on the conspiracy claims were filed in 1978. In response Inglis argued that, without regard to the "horizontal" conspiracy between the named defendant baking companies, disputed issues of fact had been raised concerning a "vertical" conspiracy between Continental, ITT, and McKinsey. Continental contended that this allegation had been raised too late in the proceedings to be considered in connection with its motions for summary judgment. Continental raises the same argument on appeal, although it appears that the district court based its decision on other grounds.

The issue presented is an unusual one. It is undisputed that Inglis' complaint alleged a conspiracy in violation of the Sherman Act. It appears, however, that throughout much of the lengthy pretrial proceedings in this case, the parties assumed that the only conspiracy at issue was the horizontal one between the named defendants. Nevertheless, Inglis' complaint

---

**65.** Section 1 of the Sherman Act provides, in part:

> Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal.

**66.** The court declined to grant summary judgment on the alleged horizontal conspiracy between the named defendant baking companies. However, Inglis withdrew this claim during the trial.

**67.** In reaching this conclusion we have adhered to the rule that "[s]ummary judgment is properly awarded when there is no genuine issue of material fact or where, viewing the evidence and the inferences drawn therefrom in the light most favorable to the party opposing the motion, the moving party clearly is entitled to prevail as a matter of law." *Vaughn v. Teledyne, Inc.*, 628 F.2d 1214, 1218 (1980). We note that Inglis does not contend that the grant of summary judgment resulted in the exclusion of any evidence that reasonably would have been introduced had the court allowed it to present its conspiracy claims to the jury. Nor is there any contention that presentation of the conspiracy claims would have added to the damage claim; all of Inglis' claims relied on the same conduct by Continental. Finally, neither ITT nor McKinsey were named as parties defendant.

did raise the possibility of a conspiracy between one or more of the named defendants and unnamed third parties. Inglis, however, was not required to sue all of the alleged conspirators inasmuch as antitrust coconspirators are jointly and severally liable for all damages caused by the conspiracy. *Wilson P. Abraham Construction Corp. v. Texas Industries, Inc.*, 604 F.2d 897, 904 n.15 (5th Cir. 1979), *cert. granted sub nom. Texas Industries, Inc. v. Radcliff Materials, Inc.*, 449 U.S. 949, 101 S.Ct. 351, 66 L.Ed.2d 213 (1980); *Walker Distributing Co. v. Lucky Lager Brewing Co.*, 323 F.2d 1, 8 (9th Cir. 1963), *cert. denied*, 385 U.S. 976, 87 S.Ct. 507, 17 L.Ed.2d 438 (1966). Nor was Inglis required to name all of the coconspirators in its complaint. *Walker Distributing Co., supra*, 323 F.2d at 8.

Notwithstanding these settled principles, Inglis was required, at some point, to make more concrete the nature of its "vertical" conspiracy allegations. The federal rules contemplate that the process of defining and narrowing the issues raised in the pleadings will be accomplished through discovery and other pretrial procedures. *See Conley v. Gibson*, 355 U.S. 41, 47–48, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957); 5 C. Wright & A. Miller, Federal Practice and Procedure: Civil § 1182, at 12 (1969). Through these procedures, a party may even be permitted to alter the legal theory of its case, "provided always that a late shift in the thrust of the case will not prejudice the other party in maintaining his defense upon the merits." 5 C. Wright & A. Miller, *supra*, § 1219, at 145. *See Armstrong Cork Co. v. Lyons*, 366 F.2d 206 (8th Cir. 1966). The issue therefore is whether Inglis was entitled to rely on a "vertical" conspiracy claim, the nature of which was not evident from the pleadings as originally filed, to defeat a motion for summary judgment made six years after the first amended complaint was filed.

The record indicates that Inglis did name ITT and McKinsey as the previously unnamed coconspirators in supplemental answers to interrogatories filed March 8, 1977, one year prior to commencement of trial. At least no later than this date, Continental was placed on notice of Inglis' claim in a manner envisioned by the federal rules.[68] Although the record does not precisely indicate when Inglis became aware of the connection between Continental, ITT, and McKinsey, it clearly occurred subsequent to the filing of the first amended complaint.

Continental undoubtedly had explored the legal ramifications of the alleged horizontal conspiracy between the named defendants, and the factual relationship between Continental, ITT, and McKinsey also had been explored in discovery in connec-

---

68. The district court could have considered Inglis' allegations as a motion to amend the proceedings to add an additional conspiracy claim pursuant to Fed.R.Civ.P. 15(a). *See Sherman v. Hallbauer*, 455 F.2d 1236, 1242 (5th Cir. 1972). Amendments for the purpose of adding new claims are clearly permitted by Rule 15 and may be introduced and considered during the pendency of a motion for summary judgment. 6 Moore's Federal Practice ¶ 56.10 (2d ed. 1976). "Indeed at times it will be feasible to treat the pleading as though it were amended to conform to the facts set forth in the affidavits." *Id.* at 56–171.

Motions to amend the pleadings "out of time" are addressed to the discretion of the court, but "leave shall be freely given when justice so requires." Fed.R.Civ.P. 15(a). *See Jacobson v. Rose*, 592 F.2d 515, 519 (9th Cir. 1978), *cert. denied*, 442 U.S. 930, 99 S.Ct. 2861, 61 L.Ed.2d 298 (1979). Although several factors may be relevant in determining whether leave to amend should be granted, *see Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962), the most important is whether amendment would result in undue prejudice to the opposing party, *Howey v. United States*, 481 F.2d 1187, 1190 (9th Cir. 1973). In this case Continental would not have been severely prejudiced by the addition of a conspiracy claim involving ITT and McKinsey. Although the claim was raised on the eve of trial, delay in proposing amendment, without a showing of prejudice, is normally insufficient to justify denial of leave to amend. *Howey v. United States, supra*, 481 F.2d at 1190–91; 6 C. Wright & A. Miller, *supra*, § 1488, at 438–39. As previously noted, Continental had received notice of Inglis' claims one year before the trial commenced. And, as we explain in the text, we are convinced that Continental was not seriously prejudiced by consideration of the "vertical" conspiracy claim.

tion with Inglis' attempt to develop evidence of Continental's specific intent to monopolize the wholesale bread market. These explorations provide no reason to believe that Continental was unprepared to litigate the "vertical" conspiracy claim. Its existing preparation for defense of the attempt to monopolize and horizontal conspiracy claims "necessarily included a factual and legal investigation covering the same area" as the new conspiracy claim. *Howey v. United States*, 481 F.2d 1187, 1191 (9th Cir. 1973).

Therefore, we hold that the district court's consideration of the claim in connection with Continental's motion for summary judgment was proper.

### 2. *The Intra-Enterprise Conspiracy*

██ The district court granted summary judgment for Continental, in part because it found that Continental and ITT, because of their parent-subsidiary relationship, were legally incapable of conspiring to violate the law. We disagree.

"An antitrust conspiracy, no less than other proscribed conspiracies, requires a plurality of actors concerting their efforts towards a common goal." *Mutual Fund Investors, Inc. v. Putnam Management Co.*, 553 F.2d 620, 625 (9th Cir. 1977). Continental is the wholly owned subsidiary of ITT. The issue is whether they should be treated as distinct economic entities for purposes of the antitrust conspiracy laws. The Supreme Court repeatedly has held that "common ownership and control does not liberate corporations from the impact of the antitrust laws ... especially where [they] hold themselves out as competitors." *Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, Inc.*, 340 U.S. 211, 215, 71 S.Ct. 259, 261, 95 L.Ed. 219 (1951). *Accord, Perma Life Mufflers, Inc. v. International Parts Corp.*, 392 U.S. 134, 141–42, 88 S.Ct. 1981, 1985, 20 L.Ed.2d 982 (1968); *Timken Roller Bearing Co. v. United States*, 341 U.S. 593, 598, 71 S.Ct. 971, 974, 95 L.Ed. 1199 (1951); *United States v. Yellow Cab Co.*, 332 U.S. 218, 227, 67 S.Ct. 1560, 1565, 91 L.Ed. 2010 (1947). However, just as the fact of common own-

ership alone should not insulate corporations from the antitrust laws, this court has held that "the mere formality of separate incorporation is not, without more, sufficient to provide the capability for conspiracy." *Harvey v. Fearless Farris Wholesale, Inc.*, 589 F.2d 451, 456 (9th Cir. 1979). *Accord, Las Vegas Sun, Inc. v. Summa Corp.*, 610 F.2d 614, 617 (9th Cir. 1980); *Mutual Fund Investors, supra*, 553 F.2d at 625–26; *Knutson v. Daily Review, Inc.*, 548 F.2d 795, 802 (9th Cir. 1976), *cert. denied*, 433 U.S. 910, 97 S.Ct. 2977, 53 L.Ed.2d 1094 (1977). *See Sunkist Growers, Inc. v. Winckler & Smith Citrus Products Co.*, 370 U.S. 19, 82 S.Ct. 1130, 8 L.Ed.2d 305 (1962).

Within these perimeters a court must examine the facts of the particular case to determine whether related corporate entities are capable of conspiracy. The purpose of this examination is to determine whether the corporations have "antitrust significance as separate economic units." *Harvey v. Fearless Ferris Wholesale, supra*, 589 F.2d at 458. ITT is not engaged in the production or sale of bread, nor does it perform any related business function other than that of a holding company for a conglomeration of other businesses. As Continental emphasizes, this is not a situation in which concerted activity by a parent and its subsidiary would restrain trade between the two, or between the subsidiary and another subsidiary in the same family engaged in the same or a related line of business. *See Timken Roller Bearing, supra; Kiefer-Stewart, supra; Las Vegas Sun, supra; Knutson v. Daily Review, supra; De Voto v. Pacific Fidelity Life Insurance Co.*, 516 F.2d 1 (9th Cir.), *cert. denied*, 423 U.S. 894, 96 S.Ct. 194, 46 L.Ed.2d 126 (1975). Nor is this a case of vertically related operating companies, such as a manufacturer and distributor, a wholesaler and retailer, or a supplier and purchaser, in which the power of one is used to restrain trade between the other and its competitors. *See Perma Life Mufflers, supra; United States v. Yellow Cab Co., supra; Harvey v. Fearless Farris Wholesale, supra*.

Nevertheless, we do not believe that the doctrine of intra-enterprise conspiracy is limited to such situations. The lack of competition between Continental and ITT in the wholesale bread market and the lack of a vertical operating relationship between the companies are facts that militate against a finding of capacity to conspire, but they are not conclusive. Our reading of cases within our circuit such as *Las Vegas Sun, Harvey,* and *Knutson* convinces us that two corporations, although part of the same corporate "family," are capable of conspiring unless they function as a single economic unit.

The existing record provides no reliable answer to whether Continental and ITT did or did not so function. Nothing in the record shows conclusively that ITT directed Continental's pricing activity in the northern California market. In fact, the evidence indicates that Continental was given considerable operating autonomy. In any event, the district court apparently did not explore the details of the ITT-Continental relationship because of its conclusion that the two were incapable of conspiring so long as ITT did not compete in the wholesale bread market and did not act as a manufacturer or supplier to Continental. Such an exploration was necessary before the summary judgment motion could be properly considered. The possibility of less than total involvement of a large holding company in the competitive affairs of one of its operating subsidiaries in a way that might strengthen an anticompetitive assault perpetrated by that subsidiary, is of sufficient concern to antitrust policy to require further investigation of an alleged conspiracy.

We express no views about the existence of such a conspiracy in this case. We note, however, that although a conspiracy may be inferred from circumstantial evidence, Inglis must show an understanding between the alleged coconspirators with the specific intent of each to restrain trade or monopolize the market. With appropriate regard for this requirement, the typically close relationship between parent and subsidiary could too easily give rise to inferences of conspiratorial activity. Antitrust laws should not deter legitimate consultation between a holding company and its subsidiary with regard to financial planning or the establishment of lawful economic goals to be pursued by the subsidiary.

### 3. *The McKinsey & Co. Conspiracy*

The naming of the consulting firm of McKinsey & Co. as a nonparty coconspirator with Continental was based on McKinsey's preparation of a report, discussed previously, which mentioned the possibility of Continental's "holding prices" as a means of combatting private label bread. Continental has argued that McKinsey, like ITT, was legally incapable of conspiring, given its lack of economic interest in the northern California bread market. Even though Continental's argument is defective, we agree with the district court that no triable issue of fact existed with respect to McKinsey's participation in a conspiracy.

A conspiracy occurs only when the parties have reached "a unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement." *American Tobacco Co. v. United States,* 328 U.S. 781, 809–10, 66 S.Ct. 1125, 1138, 90 L.Ed. 1575 (1946). The evidence available to the district court indicated that McKinsey had prepared a report for Continental analyzing means of responding to competition by private and captive label bread producers. Near the end of this voluminous report appeared a list of further subjects for study, including the possibility of "maintain[ing] prices to hasten wholesaler exit pace." As we have already noted, there was no evidence that Continental ever considered or adopted this proposal, or that McKinsey was ever directed to pursue its suggestion further, or that McKinsey knew of Continental's plans or actual activity in the northern California market. In addition, the language of the report itself does not indicate clearly that unlawful conduct was even proposed for further study. Although we recognize that a conspiracy may be inferred from conduct

and need not be proved by evidence of an express agreement, *e. g., United States v. Paramount Pictures, Inc.*, 334 U.S. 131, 142, 68 S.Ct. 915, 921, 92 L.Ed. 1260 (1948); *American Tobacco Co. v. United States, supra*, 328 U.S. at 809–10, a reasonable inference of unlawful conspiracy was not possible based on facts as meager as these.[69] Accordingly, we hold that the district court did not err in granting summary judgment with respect to the alleged conspiracy between Continental and McKinsey. *See Mutual Fund Investors, supra*, 553 F.2d at 626–27.

### B. The "Relation Back" Issue

Inglis filed its original complaint on October 1, 1971, and its first amended complaint on February 1, 1972. On February 7, 1977, Inglis moved for leave to file a supplemental complaint pursuant to Fed.R.Civ.P. 15(d). The supplemental complaint incorporated by reference all of the allegations contained in the first amended complaint, and alleged that the defendants had continued their violations until April 6, 1976, the date on which Inglis discontinued its bakery operations. The district court granted Inglis' motion and noted that it would deem the supplemental complaint "timely filed under the relation back doctrine." However, during trial the court reconsidered its order and decided to apply the federal and state statutes of limitation to the supple-

mental complaint. The effect of this ruling was to create two damage periods, one measured from the date of the original complaint and the other from the date on which Inglis moved for leave to file the supplemental complaint.[70] This left a gap between the two damage periods of one year for purposes of the federal claims (February 2, 1972—February 6, 1973) and four years for purposes of the pendent state claims (February 2, 1972—February 6, 1976).[71] The court permitted Inglis to introduce evidence of violations that occurred during those periods in order to prove liability on the attempt to monopolize claim, but instructed the jury that Inglis could not recover damages flowing from those violations. Inglis contends that the court's refusal to allow the supplemental complaint to "relate back" to the date of the original complaint was erroneous. We agree.

We so hold despite the fact that the general rule in private antitrust actions is that the plaintiff may not recover damages arising from acts committed after the filing of the complaint, even when those acts are alleged to be part of a continuing conspiracy or course of conduct. *Cornwell Quality Tools Co. v. C. T. S. Co.*, 446 F.2d 825, 832 (9th Cir. 1971), *cert. denied*, 404 U.S. 1049, 92 S.Ct. 715, 30 L.Ed.2d 740 (1972); *Washington State Bowling Proprietors Ass'n v. Pacific Lanes, Inc.*, 356 F.2d

**69.** Our holding should not be interpreted to mean that McKinsey's report was inadmissible as evidence of Continental's intent for purposes of Inglis' attempt to monopolize claim. We express no views on that subject.

**70.** The district court decided that, in applying the statute of limitations to the supplemental complaint, Inglis' motion for leave to file would be the action tolling the statute, rather than the actual filing of the complaint after leave had been granted. This ruling is not argued on appeal.

**71.** Federal antitrust claims are governed by a four-year statute of limitations. 15 U.S.C. § 15b (1976). The damage period established by the filing of the original complaint, as amended, was October 1, 1967, through February 1, 1972. The district court applied the same four-year limitation period to the claims alleged in the supplemental complaint. This period began on February 7, 1973 (four years

prior to the date on which Inglis moved for leave to file the supplemental complaint) and continued until April 6, 1976 (the date on which Inglis discontinued its bakery operations). Thus, the gap between the two damage periods extended from February 2, 1972, through February 6, 1973.

The parties agreed that the pendent state claims were governed by a one-year statute of limitations. Thus the damage period tolled by the filing of the original and amended complaints was October 1, 1970, through February 1, 1972. The damage period tolled by the filing of the supplemental complaint began on February 7, 1976, and, again, extended until April 6, 1976, the date on which Inglis ceased operations. This produced a four-year gap in the damage period for state claims consisting of the period February 2, 1972, through February 6, 1976.

371, 377 (9th Cir.), *cert. denied*, 384 U.S. 963, 86 S.Ct. 1590, 16 L.Ed.2d 674 (1966); *Flintkote Co. v. Lysfjord*, 246 F.2d 368, 394 (9th Cir.), *cert. denied*, 355 U.S. 835, 78 S.Ct. 54, 2 L.Ed.2d 46 (1957). Our holding, however, finds support in the authorities that recognize that in appropriate cases, the trial court, following the filing of a supplemental complaint, may permit the recovery of damages resulting from wrongful acts committed subsequent to the filing of the action. *Borger v. Yamaha International Corp.*, 625 F.2d 390, 398 (2d Cir. 1980); *Washington State Bowling Proprietors, supra*, 356 F.2d at 377; *Flintkote, supra*, 246 F.2d at 396.

▮▮▮▮ Rule 15(d), which authorizes supplemental complaints, provides in part:

Upon motion of a party the court may, upon reasonable notice and upon such terms as are just, permit him to serve a supplemental pleading setting forth transactions or occurrences or events which have happened since the date of the pleading sought to be supplemented. . . .

Continental's conduct subsequent to the filing of suit was the proper subject of a supplemental complaint. The purpose of Rule 15(d) is to promote as complete an adjudication of the dispute between the parties as possible by allowing the addition of claims which arise after the initial pleadings are filed. *See Case-Swayne Co. v. Sunkist Growers, Inc.*, 369 F.2d 449, 462 (9th Cir. 1966), *rev'd on other grounds*, 389 U.S. 384, 88 S.Ct. 528, 19 L.Ed.2d 621 (1967); *United States ex rel. Atkins v. Reiten*, 313 F.2d 673, 674–75 (9th Cir. 1963); 6 C. Wright & A. Miller, Federal Practice and Procedure: Civil § 1504 (1971). When the supplemental pleading states new claims, as opposed to curing defects in an original complaint, statute of limitations questions are unlikely to arise, because it is unlikely that the entire limitations period will expire between commencement of suit and the filing of the supplemental pleading. However, in this case such questions are clearly raised. As we see it, whether the supplemental complaint may encompass the entire period following commencement of suit, despite the statute of limitations, will depend upon the nature of the claims raised in the supplemental pleading. If those claims are unrelated to those alleged in the initial complaint, or rely on conduct or events different from those involved in the original action, the statute of limitations should be applied. *See Blau v. Lamb*, 191 F.Supp. 906, 906 (S.D.N.Y.1961), *rev'd on other grounds*, 314 F.2d 618 (2d Cir.), *cert. denied*, 375 U.S. 813, 84 S.Ct. 44, 11 L.Ed.2d 49 (1963). Where, however, the original pleading gave notice that the alleged wrongful conduct was of a continuing nature, supplemental pleadings addressed to the same conduct should not encounter statute of limitations questions.[72]

▮▮▮ We are satisfied that Inglis' original pleadings provided Continental adequate notice of the subject matter of the action. They alleged a continuing course of conduct and contained prayers for injunctive relief as well as for damages. Indeed, Continental's continuing course of conduct after commencement of the action was the subject of a preliminary injunction hearing several years after the original complaint was filed. *See William Inglis & Sons Baking Co. v. ITT Continental Baking Co.*, 389 F.Supp. 1334 (N.D.Cal.), *rev'd*, 526 F.2d 86 (9th Cir. 1975). We are also satisfied that allowing the supplemental complaint to encompass events without regard to the statute of limitations will not prejudice Conti-

---

**72.** Professors Wright and Miller have explained that

if the original pleading gave defendant notice that the conduct, transaction, or occurrence is of a continuing nature, he should be prepared to defend against all claims arising out of it, whether they arose before or after the original complaint was filed. There is little basis to distinguish an amended and a supplemental pleading for purposes of relation back if defendant had notice of the subject matter of the dispute and was not prejudiced in preparing his defense. Under these circumstances, the policy against stale claims becomes subsidiary to the policy expressed throughout the rules in favor of allowing a party to set forth all his grievances against another party in one action and resolving them on their merits.

6 C. Wright & A. Miller, *supra*, § 1508, at 556.

**1058**

nental. The supplemental complaint merely restated the allegations of the initial pleadings and further alleged only that the claimed violations had continued. Of course, the complaint was based on new events, but these events are a continuation of the old cause of action. *See Griffin v. County School Board,* 377 U.S. 218, 226–27, 84 S.Ct. 1226, 1230, 12 L.Ed.2d 256 (1964). Under these circumstances, we hold that the district court erred.

## VII.

For all the reasons set forth in this opinion, we reverse the entry of JNOV by the trial court and remand this case to the district court for a new trial in accordance with the views expressed in this opinion.

Affirmed in part, reversed in part, and remanded.

JOHN W. PECK, Circuit Judge, concurring in part and dissenting in part.

I concur in the majority's judgment on all issues except the necessity of a new trial of Inglis's attempt-to-monopolize and Robinson-Patman causes of action. On these I would affirm the district court's grant of judgment n. o. v.

As the majority notes, Inglis's direct evidence of Continental's specific intent to monopolize was inconclusive and legally insufficient. Inglis's evidence of "predatory" conduct was likewise insufficient, even coupled with the purported direct evidence of intent, to permit inferences of intent to monopolize and of dangerous probability of success.

The majority holds that "a new trial is warranted because the evidence upon which Inglis depended to prove predatory conduct was not based upon a calculation of which costs were fixed and which variable that was rooted in the particular facts of this case." A plaintiff's failing to present competent evidence does not warrant a new trial of the plaintiff's cause. Inglis adopted a rigid definition of variable costs, with the result that its evidence of Continental's supposed below-cost sales proved nothing. Inglis's counsel adopted this definition through an utterly wooden reading of a footnote in this Court's opinion in *Janich Bros., Inc. v. American Distilling Co.,* 570 F.2d 848 (1977), *cert. denied,* 439 U.S. 829, 99 S.Ct. 103, 58 L.Ed.2d 122 (1978). The footnote defines variable costs as those that vary with changes in output, and goes on to describe what the term *typically* comprises. *See id.,* 570 F.2d at 858 n. 11. Inglis ignored the definition and fastened on the description—at its own risk. Inglis's misapplication of law to the facts of its case does not entitle it to a new trial.

It could be argued that the rules governing predatory pricing that the majority announces today are so novel that retrial under these new rules is required. The majority's chief innovation is the creation of a rebuttable presumption of the illegality of prices shown by a plaintiff to be below a defendant's average variable costs. The district court's "erroneous" application of a marginal-cost standard did not result in the exclusion of any evidence that is material under the rule announced by the majority today. Since the district court treated average variable cost as the "evidentiary surrogate" of marginal cost, Inglis tried (and failed) to show that Continental sold below its average variable costs of producing private label white bread. There is no reason why Inglis should be given a second opportunity to make this showing. The judgment n. o. v. on the attempt-to-monopolize cause should, I feel, be affirmed.

My more basic disagreement with the majority's opinion concerns its implicit holding that mere proof of pricing below average variable cost supports inferences of both specific intent to monopolize and dangerous probability of success. The majority states that probable success may be inferred from evidence of conduct alone, if the conduct is the sort from which specific intent may also be inferred. Since proof of pricing below average variable cost states a prima facie case of predatory pricing, the majority permits the double inference from evidence of that conduct alone.

Pricing below average variable cost is sufficiently ambiguous that the inference of dangerous probability of success should not be automatic. The majority's opinion reduces the former "element"[1] of dangerous probability to a matter of affirmative defense, with the result, I fear, of encouraging wasteful and futile antitrust litigation. See Handler & Steuer, *Attempts to Monopolize and No-Fault Monopolization*, 129 U.Pa.L.Rev. 125, 162 (1980).

This reallocation of burdens or proof departs sharply from this Circuit's former rule that specific intent to monopolize, and hence probability of success, cannot be inferred from conduct alone unless the conduct is exclusionary or otherwise restrains trade. *See Hunt-Wesson Foods, Inc. v. Ragu Foods, Inc.*, 627 F.2d 919, 925–26 (9th Cir. 1980), *cert. denied*, 450 U.S. 921, 101 S.Ct. 1369, 67 L.Ed.2d 348 (1981); *California Computer Prods. v. IBM*, 613 F.2d 727, 743 (9th Cir. 1979); *Janich, supra*, 570 F.2d at 857; *Greyhound Computer Corp. v. IBM*, 559 F.2d 488, 505 (9th Cir. 1977), *cert. denied*, 434 U.S. 1040, 98 S.Ct. 782, 54 L.Ed.2d 790 (1978); *Twin City Sportservice, Inc. v. Charles O. Finley & Co.*, 512 F.2d 1264, 1276 (9th Cir. 1975). Evidence of a defendant's pricing below average variable cost does not demonstrate exclusionary conduct. The correlation between exclusionary intent and pricing below average variable cost (or short-run marginal cost) is far from being empirically verified. *See generally* Scherer, *Predatory Pricing and the Sherman Act: A Comment*, 89 Harv.L.Rev. 869, 880 (1976).

Moreover, variable costs are difficult enough for economists and legal specialists to define. *E. g.*, R. Bork, *The Antitrust Paradox*, 154 (1978); Williamson, *Williamson on Predatory Pricing II*, 88 Yale L.J. 1183, 1196 (1979). There is no reason to think that juries, even acting under appropriate instructions, will be able to define them properly. The majority states that

[C]ost categories are solely for the purpose of providing aid in answering the ultimate question: Did the justification for the defendant's price depend upon its anticipated destructive effect on competition or was the price justified as a reasonably calculated means of maximizing profits, minimizing losses, or achieving some other legitimate end? Accordingly, we hold that the determination of fixed and variable costs is a matter for the jury under appropriate instructions.

The "accordingly" is revealing. The majority allows automatic inferences, but cannot ensure that they will be drawn in the right direction. The way lies open for juries to infer pricing below average variable cost from the jurors' preliminary view of the predatory nature of the defendant's conduct, instead of vice-versa.

The majority's rationale for vacating the JNOV on Inglis's Robinson-Patman cause parallels its rationale for vacating the JNOV on Inglis's attempt-to-monopolize cause. For reasons stated in essence above, I would affirm it.

I join in all other parts of the majority's compendious opinion, and note that the trial court's refusal to allow Inglis's supplemental complaint to "relate back" does not require retrial of any of Inglis's federal causes, because no material evidence was excluded because of that erroneous ruling.

## ORDER

Before BROWNING, PECK *, and SNEED, Circuit Judges.

The panel as constituted in the above case has voted to deny the petitions for rehearing and to reject the suggestions for rehearing en banc.

---

1. Probability of success is admittedly not an "essential" element of an attempt-to-monopolize claim in this Circuit, since the probability may be inferred from proof of intent. *California Computer Prods. v. IBM*, 613 F.2d 727, 737 (9th Cir. 1979); *Lessig v. Tidewater Oil Co.*, 327 F.2d 459, 474 (9th Cir.), *cert. denied*, 377 U.S. 993, 84 S.Ct. 1920, 12 L.Ed.2d 1046 (1964). I

question only the dual inference of intent and dangerous probability of success from proof of conduct *alone*.

* Honorable John W. Peck, Senior United States Circuit Judge for the Sixth Circuit, sitting by designation.

The full court has been advised of the suggestions for en banc rehearing. One judge of the court requested the matter be considered en banc. A vote of all active judges was taken and a majority voted against en banc consideration.

The petitions for rehearing are denied and the suggestions for a rehearing en banc are rejected.

WALLACE, Circuit Judge, dissenting from denial to rehear en banc:

I dissent from the court's refusal to rehear this case *en banc*. To prevent intra-circuit conflict, panels of this court must follow precedent or urge the court's active judges to overrule the precedent *en banc*. *See, e.g., United States v. Smith*, 645 F.2d 747, 748 (9th Cir. 1981) (Reinhardt, J., concurring specially), *reheard en banc*, No. 80–1380 (argued Dec. 18, 1981). Yet by failing to take this case *en banc*, we have sanctioned a decision which departs from the settled law of this Circuit. Through a strained and unpersuasive reading of prior cases, the majority seeks to harmonize the "novel" and "innovative" rule it invents, *ante* at 1058–1059 (Peck, J., dissenting), with the rule it, in effect, rejects. In addition, the majority's holding is an unjustified departure from the economically-sound marginal cost rule. By permitting this result, the court not only approves the use of an amorphous, unpredictable test for predatory pricing, but also leaves district courts in the Circuit with no guidance as to which rule—the "marginal cost rule" or the *Inglis* reformulation—should apply to pretrial dismissal motions in antitrust cases. Therefore, I respectfully dissent.

**I**

Section 2 of the Sherman Act, 15 U.S.C. § 2, proscribes monopolization and attempts to monopolize. The three elements of an attempted monopolization claim—specific intent to control prices or destroy competition; predatory or anticompetitive conduct directed to accomplishing the unlawful purpose; and a dangerous probability of suc-cess—interact. Thus, specific intent and a dangerous probability of success may, in appropriate cases, be inferred from predatory or anticompetitive conduct.

If this were all the majority sought to articulate in *Inglis*, there would be no departure from our prior decisions. However, *Inglis* attempts a dramatic expansion of the types of anticompetitive or predatory conduct which will support an inference of the other two elements of a section 2 attempted monopolization claim. First, as Judge Peck recognized in his dissent, the majority's opinion "departs sharply from this Circuit's former rule that specific intent to monopolize, and hence probability of success, cannot be inferred from conduct alone unless the conduct is exclusionary or otherwise restrains trade." *Ante* at 1059. Second, the majority's opinion seeks to relegate the marginal cost rule, which represents a workable, predictable and efficient means of determining what sorts of pricing constitute predatory conduct under the Sherman Act, to the slag heap of discarded antitrust formulae, and to substitute in its place a subjective and amorphous test involving a shifting burden of proof which leaves to the jury, in nearly every case, decisional authority on attempted monopolization claims.

I do not disagree with the majority's basic, abstract definition of predatory pricing: "Pricing is predatory only where the firm foregoes short-term profits in order to develop a market position such that the firm can later raise prices and recoup lost profits." *Ante* at 1031, *quoting Janich Bros., Inc. v. American Distilling Co.*, 570 F.2d 848, 856 (9th Cir. 1977), *cert. denied*, 439 U.S. 829, 99 S.Ct. 103, 58 L.Ed.2d 122 (1978) (*Janich*). I do believe, however, that in the majority's attempt to "eschew dogmatic adherence to a particular, rigid test and to fashion broad and flexible objective standards concerned with accurately evaluating the purposes of business behavior," *ante* at 1031 n.18, it has advocated an unworkable test for distinguishing price reductions that constitute legitimate, competitive responses to market conditions from price reductions that are predatory attempts to monopolize the relevant market. The result may well

deprive the American public of the benefits flowing from competition on the merits.

Under the majority's test:

> [T]o establish predatory pricing a plaintiff must prove that the anticipated benefits of defendant's price depend on its tendency to discipline or eliminate competition and thereby enhance the firm's long-term ability to reap the benefits of monopoly power. *If the defendant's prices were below average total cost but above average variable cost, the plaintiff bears the burden of showing defendant's pricing was predatory.* If, however, the plaintiff proves that the defendant's prices were below average variable cost, the plaintiff has established a prima facie case of predatory pricing and the burden shifts to the defendant to prove that the prices were justified without regard to any anticipated destructive effect they might have on competitors.

*Ante* at 1035–1036 (emphasis added). This "standard" is not a formula or test for predatory pricing in any meaningful sense of those terms; rather, it merely restates the basic, abstract principle on which there is no disagreement, and injects into it the new variable of burden of proof, subject, of course, to the final decision of the jury. Not only is this standard wrong from an antitrust policy perspective, but it is inconsistent with the workable approach developed by this Circuit over the past five years to define predatory pricing—the "marginal cost rule."

## II

In my view, the fairly settled law of this Circuit prior to *Inglis* was that we had adopted the test advocated by Professors Areeda and Turner in their article *Predatory Pricing and Related Practices Under Section 2 of the Sherman Act*, 88 Harv.L.Rev. 697 (1975), qualified by refinements or exceptions that might be developed through case-by-case analysis. Since an efficient manufacturer will set prices where price equals or exceeds marginal cost, prices should be considered predatory only if they are less than the defendant's marginal cost.

Prices set at marginal cost can injure only less efficient manufacturers. Thus, "pricing at marginal cost is the competitive and socially optimal result," *id.* at 711, quoted with approval in *Janich, supra,* 570 F.2d at 857 & n.9. Instead of making a new exception to the marginal cost rule, the majority's opinion attempts to eliminate the rule because it concludes that it was not compelled to follow it, even though our previous cases have announced and confirmed it.

It takes only a brief review of these prior cases to demonstrate that this Circuit has adopted the marginal cost test as the standard for measuring what constitutes predatory pricing. In *Hanson v. Shell Oil Co.,* 541 F.2d 1352 (9th Cir. 1976), *cert. denied,* 429 U.S. 1074, 97 S.Ct. 813, 50 L.Ed.2d 792 (1977) (*Hanson*), we affirmed a directed verdict entered in favor of the defendant where, as here, the plaintiff had introduced no evidence that the defendant's prices were less than its marginal cost. In so doing we clearly stated the rule that predation

> could be shown by evidence that Shell was selling its gasoline at below marginal cost or, because marginal cost is often impossible to ascertain, below average variable costs .... *Hanson's failure to show that Shell's prices were below its marginal or average variable cost was a failure as a matter of law to present a prima facie case under § 2.*

*Id.* at 1358–59 (emphasis added, footnotes omitted). In a footnote we restated this holding. "[P]roof of pricing below marginal or average variable cost is [a] prerequisite to a prima facie showing of an attempt to monopolize ...." *Id.* at 1359 n.6. We also articulated the reasoning supporting the marginal cost rule.

> If its prices were above its costs, and nevertheless Shell's [sic] did drive Hanson out of business, this can only be because Hanson was so inefficient that at prices at which Shell could make a reasonable profit he could not. The antitrust laws were not intended, and may not be used, to require businesses to price their products at unreasonably high prices (which

penalize the consumer) so that less efficient competitors can stay in business. The Sherman Act is not a subsidy for inefficiency.

*Id.* at 1358–59.

In *Hanson*, therefore, we established the general test for predatory pricing—the marginal cost rule. We reaffirmed this test in *Janich* where we stated that "an across-the-board price set at or above marginal cost should not ordinarily form the basis of an antitrust violation." 570 F.2d at 857 (footnote omitted). There, as in *Hanson*, we affirmed a directed verdict entered for the defendant where the plaintiff had been unable to show that the defendant set any of its prices below its marginal cost. "Janich did not produce evidence that American's prices were below its average variable costs." *Id.* at 858.[1] In *California Computer Prods., Inc. v. IBM Corp.*, 613 F.2d 727 (9th Cir. 1979) (*California Computer*), we followed *Janich* and *Hanson* by holding that failure to show that the defendant's prices were less than its marginal or average variable costs was a failure as a matter of law to raise a prima facie case of predatory pricing. *Id.* at 743. And just recently, in *Murphy Tugboat Co. v. Crowley*, 658 F.2d 1256 (9th Cir. 1981) (*Murphy Tugboat*), we affirmed a judgment n.o.v. granted for the defendant because the plaintiff had not alleged or shown that the defendant's "marginal costs . . . ever exceeded [its] price." *Id.* at 1259 (footnote omitted).

Thus, my reading of the case law prior to *Inglis* is that proof that a defendant's prices were less than its marginal cost (or its average variable cost) was an essential element of a predatory pricing claim, whether brought under section 2 of the Sherman Act, *see Hanson, Janich*, and *California Computer*, or section 1 of the Sherman Act, *see Murphy Tugboat*. This rule was subject to several possible exceptions, which have not been precisely refined by this court because they have not been squarely presented for review. *Cf. California Computer, supra*, 613 F.2d at 743 ("refinement of the marginal or average variable cost test will be necessary as future cases arise"). On the one hand, prices above marginal or average variable cost may, in some instances, be considered predatory if (1) the price is below the defendant's short-run profit maximizing price and high barriers to entry restrict competition in the relevant market, *see Hanson, supra*, 541 F.2d at 1358 n.5; or (2) if the price is a "limit price" set by a monopolist, *see California Computer, supra*, 613 F.2d at 743. On the other hand, prices below marginal or average variable cost may, in appropriate circumstances, be considered nonpredatory if (1) they are temporary, promotional prices set by a firm without appreciable market power in order to effect the entry of a new product into an existing market, *see Areeda & Turner, supra*, at 713–15; *cf. Hanson, supra*, 541 F.2d at 1359 n.6 (below marginal cost pricing is prima facie, but not conclusive, evidence of predatory pricing); (2) they were set in a good-faith effort to meet the lower price posted by a competitor, *see California Computer, supra*, 613 F.2d at 743; *ILC Peripherals Leasing Corp. v. IBM Corp.*, 458 F.Supp. 423, 433 (N.D.Cal.1978), *aff'd sub nom., Memorex Corp. v. IBM Corp.*, 636 F.2d 1188 (9th Cir. 1980) (per curiam); or (3) as Continental argued in *Inglis*, if the defendant is confronted with an "excess capacity" situation, *see ante* at 1035; Areeda & Turner, *supra*, at 710 & n.32.

Absent these exceptional situations, however, a predatory pricing claim requires proof of prices set below marginal or average variable cost.[2] This is what *Janich*

---

1. Since marginal cost is often impossible to determine, *Janich* followed *Hanson* and Areeda & Turner in holding that average variable cost may be used as an evidentiary substitute for marginal cost. 570 F.2d at 858.

2. The majority's attempt to distinguish our previous cases is therefore not valid. The tempering language the majority isolates from *Hanson, ante* at 1033, represents two potential exceptions to the marginal cost rule. Contrary to the majority's assertion, both *Janich* and *Hanson* adopted and applied the marginal cost test; both cases affirmed directed verdicts entered for the defendant because the plaintiff had been unable to demonstrate that prices were ever set below marginal or average variable cost. The language the majority quotes from *California*

holds when it states that prices set at marginal cost "should not ordinarily form the basis for an antitrust violation." 570 F.2d at 857. If the majority in *Inglis* had followed Ninth Circuit precedent, it would have reaffirmed the marginal cost rule and, accordingly, affirmed the district court's grant of the motion for judgment n.o.v. This would not be, as the majority insists, "rigid adherence to a particular cost-based rule." *Ante* at 1035. Rather, it would merely confirm that the law of this Circuit is the marginal cost rule, a rule which includes within its scope the potential for evolution and change as future cases dictate.

### III

One resultant benefit of the marginal cost rule is that it allows the courts to exercise some degree of control over the burgeoning antitrust litigation. Since the majority holds that average variable cost is a determination to be made by the jury, *ante* at 3930, it is difficult to see how, under this standard, a district court could ever keep a predatory pricing case away from the jury. As Judge Peck wrote in his dissent:

> The majority allows automatic inferences, but cannot ensure that they will be drawn in the right direction. The way lies open for juries to infer pricing below average variable costs from the jurors' preliminary view of the predatory nature of the defendant's conduct, instead of vice-versa.

*Ante* at 1059.

The marginal cost rule prevents this sort of abdication of judicial responsibility in predatory pricing cases. In *California Computer*, for example, we affirmed a directed

verdict entered for the defendant where the plaintiff had been unable to prove that the defendant's prices were less than its marginal or average variable cost, or that the defendant's conduct was anything other than a legitimate attempt to meet lower prices offered by the competition. We wrote that "[w]ere § 2 interpreted not to exempt price cuts from attack under these circumstances, there could be no adequate guidelines for a jury to decide the issue of whether the prices at issue were 'reasonable.'" 613 F.2d at 743. Focusing as it does on a subjective characterization of the "tendency" of a defendant's price, the *Inglis* reformulation fails to provide any guidelines, let alone adequate guidelines, for the jury. It was therefore no surprise that both parties in this case urged rehearing *en banc* because, quite aside from its substantive defects, the majority's "standard" invites needless confusion of juries and offers little predictability to the business community.

The majority seems to minimize the advantages of predictability offered by the marginal cost rule. If there are legitimate competitive reasons for pricing below marginal cost then this court should recognize those reasons by creating an exception to the marginal cost test. But is it more predictable to ask the jury, as the *Inglis* standard does, to measure the "anticipated benefits" of a defendant's pricing policies, than to ask the district judge, on a motion for summary judgment or a directed verdict, to decide (1) whether the marginal cost rule applies, and (2) whether the defendant's price was below its marginal cost? To me the answer is clearly no.

In addition, one should not overlook the added burden *Inglis* will place on the dis-

---

Computer, *ante* at 1033, does not alter the fact that the panel in that case followed *Hanson* by holding that failure to show that the defendant's prices were less that its marginal or average variable cost was a failure as a matter of law to raise a prima facie case of predatory pricing. 613 F.2d at 743. Furthermore, it is eminently clear from the context of the language the majority quotes that "other aspects" of a monopolist's conduct may be considered predatory even if its pricing practices are not.

After all, predatory pricing is not the only sort of anticompetitive conduct which will support a section 2 claim of monopolization or attempted monopolization. Nor, finally, is *Murphy Tugboat* distinguishable from *Inglis* on its facts. In both cases, the plaintiffs failed to show that the defendants' marginal costs ever exceeded their prices. In *Inglis*, however, the plaintiff will be able to get its case to the jury, something the plaintiff in *Murphy Tugboat* was unable to do because of the marginal cost rule.

trict courts. Disposing of unmeritorious and strike cases by the established marginal cost rule will, if the *Inglis* reformulation is followed, be at an end. From this perspective *Inglis* is not only a change in the law of this Circuit, but one with untoward consequences for the district courts.

### IV

One may well wonder where this case leaves the district judge. *Inglis* did not, because it could not, overrule *Hanson, Janich, California Computer* and *Murphy Tugboat.* It merely distinguished them. Thus, I assume, a district judge will be free to follow them. If so, a district court may, consistent with *Inglis*, enter a directed verdict for the defendant where the plaintiff. fails to establish that the defendant ever set prices below marginal or average variable cost. This would clearly be consistent with the marginal cost rule. Moreover, it would, in the majority's own words, "not [be] inconsistent with the result[ ] reached in [*Inglis*]" because the plaintiff would not be "able to prove that the defendant had sacrificed greater profits or incurred greater losses than necessary, in order to eliminate the plaintiff." *Ante* at 1036 (footnote omitted).

As the law of this Circuit now stands, four of our decisions apply the marginal cost rule and one does not. I would think it would be difficult for this court to reverse a district judge because he or she chose to follow precedent adopted and applied by us in four cases over the past five years, rather than a newer standard advocated in an opinion which professes consistency with those four older decisions.

Needless to say, I do not believe the district judge should be presented with such an obvious conflict. It would be far more appropriate for us to eliminate this dilemma by clarifying *Inglis* with an *en banc* rehearing. Therefore, I respectfully dissent from the court's failure to do so.